OPINION EN BANC
BOUDIN, Chief Judge.
This case brings before this court the third in a series of law suits by Gregorio Igartúa, a U.S. citizen resident in Puerto Rico, claiming the constitutional right to vote quadrennially for President and Vice President of the United States. Panels of this court have rejected such claims on all *147 three occasions.[1] We now do so again, this time en banc, rejecting as well an adjacent claim: that the failure of the Constitution to grant this vote should be declared a violation of U.S. treaty obligations.
The constitutional claim is readily answered. Voting for President and Vice President of the United States is governed neither by rhetoric nor intuitive values but by a provision of the Constitution. This provision does not confer the franchise on “U.S. citizens” but on “Electors” who are to be “appoint[ed]” by each “State,” in “such Manner” as the state legislature may direct, equal to the number of Senators and Representatives to whom the state is entitled. U.S. Const, art. II, § 1, cl. 2; see also id. amend. XII.
At one time state legislatures chose the electors themselves, see McPherson v. Blacker, 146 U.S. 1, 28-35, 13 S.Ct. 3, 36 L.Ed. 869 (1892); in the modern manner, customarily a U.S. state provides that its own citizens — citizens of that state — vote for the electors to represent that state. Modern ballots may omit the names of the electors and list only the candidates, so in form it appears that citizens are voting for President and Vice President directly. But they are not: they are voting for electors and, more pertinent here, the electors are electors of the states.
Puerto Rico — like the District of Columbia, the Virgin Islands, and Guam — is not a “state” within the meaning of the Constitution. Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1, 7 (1st Cir.1992). Puerto Rico was not one of the original 13 states who ratified the Constitution; nor has it been made a state, like the other 37 states added thereafter, pursuant to the process laid down in the Constitution. U.S. Const, art. IV, § 3, cl. 1. Nor has it been given electors of its own, as was the District of Columbia in the Twenty-Third Amendment.
Puerto Rico became associated with the United States as an unincorporated territory under Article IV of the Constitution following the 1898 war between this country and Spain. U.S. Const, art. IV, § 3, cl. 2; see Insular Cases, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901). Its status has altered over the ensuing period, culminating in an agreement in 1952, approved by the citizens of Puerto Rico, that Puerto Rico should have a unique “Commonwealth” status; but the unique status is not statehood within the meaning of the Constitution. See Trailer Marine, 977 F.2d at 7; Igartúa II, 229 F.3d at 87-88 & nn. 15-16 (Torruella, J., concurring). And, in recent elections, Puerto Ricans themselves have been substantially divided as to whether to seek statehood status. Cf. Rossello-Gonzalez v. Calderon-Serra, 398 F.3d 1, 4-5 (1st Cir.2004).
As Puerto Rico has no electors, its citizens do not participate in the presidential voting, although they may do so if they take up residence in one of the 50 states and, of course, they elect the Governor of Puerto Rico, its legislature, and a nonvoting delegate to Congress. Like each state’s entitlement to two Senators regardless of population, the make-up of the electoral college is a direct consequence of how the framers of the Constitution chose to structure our government — a choice itself based on political compromise rather than conceptual perfection. Note, Rethinking the Electoral College Debate: The Fram *148 ers, Federalism, and One Person, One Vote, 114 Harv. L.Rev. 2526, 2526-31 (2001) (discussing historical commentary).
That the franchise for choosing electors is confined to “states” cannot be “unconstitutional” because it is what the Constitution itself provides. Hence it does no good to stress how important is “the right to vote” for President. Although we recognize the loyalty, contributions, and sacrifices of those who are in common citizens of Puerto Rico and the United States, much the same could have been said about the citizens of the District of Columbia, who were voteless over a much longer period. The path to changing the Constitution lies not through the courts but through the constitutional amending process, U.S. Const. art. V; and the road to statehood — if that is what Puerto Rico’s citizens want — runs through Congress. U.S. Const, art. IV, § 3, cl. 1.
This court has thrice rejected the constitutional claim now advanced by Igartúa. The Ninth Circuit reached the same result in a similar suit concerning Guam. Attorney General of the Territory of Guam v. United States, 738 F.2d 1017 (9th Cir.1984). The Supreme Court denied certiorari in both Igartúa I, 514 U.S. 1049, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995), and in the Ninth Circuit case, 469 U.S. 1209, 105 S.Ct. 1174, 84 L.Ed.2d 323 (1985). Igartúa has offered nothing new in this third case to support his constitutional claim. In this en bane decision, we now put the constitutional claim fully at rest: it not only is unsupported by the Constitution but is contrary to its provisions.
Igartúa’s complaint also relied upon U.S. treaties — technically, two of the three are not treaties — as a premise for the suffrage right claimed.[2] This theory had been advanced and rejected by this court in Igartúa I, 32 F.3d at 10 n. 1, which was binding on the panel and could not be altered by it. Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 160 & n. 4 (1st Cir.2004). After the panel granted rehearing in this case to examine a more elaborate version of the treaty argument, the en banc court determined that the matter should be heard by the full court. Two of the three panel members said that they were content with this course. Only one judge dissented from the proposal to hear the case en banc. See Igartúa de la Rosa, 407 F.3d 30.
No treaty claim, even if entertained, would permit a court to order that the electoral college be enlarged or reapportioned. Treaties — sometimes—have the force of domestic law, just like legislation; but the Constitution is the supreme law of the land, and neither a statute nor a treaty can override the Constitution. Reid v. Covert, 354 U.S. 1, 16-18, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality opinion); Matter of Burt, 737 F.2d 1477, 1484 (7th Cir.1984); Plaster v. United States, 720 F.2d 340, 348 (4th Cir.1983) (collecting case law). See also Marbury v. Madison, 5 U.S. (1 Cranch.) 137, 180, 2 L.Ed. 60 (1803) (“a law repugnant to the constitution is void”). So the treaty claim, originally made in support of injunctive relief, is now recast by proponents as a demand for “a declaration” that the United States is in violation of its treaty obligations for *149 failing to “take steps” to give a presidential vote to citizens of Puerto Rico.
There are a host of problems with the treaty claim, including personal standing, redressability, the existence of a cause of action, and the merits of the treaty interpretations offered. Treaties are made between states (in the international usage of that term) and citizens do not automatically have a right to sue upon them.[3] The present claim is also probably not justicia-ble in the sense that any effective relief could be provided;[4] it is enough to let common sense play upon the conjecture that the Constitution would be amended if only a federal court declared that a treaty’s generalities so required. See Simon, 426 U.S. at 44, 96 S.Ct. 1917 (“unadorned speculation [as to redress] will not suffice to invoke the federal judicial power”).
Nor are the merits of Igartúa’s reading of the treaties at all straightforward. The language of each of the treaties invoked is general. Nothing in them says anything about just who should be entitled to vote for whom, or that an entity with the negotiated relationship that the United States has with Puerto Rico is nevertheless required to adopt some different arrangement as to governance or suffrage. In 1951, Puerto Ricans themselves acceded to their present Commonwealth status,[5] and they are today divided as to what relationship they would prefer on the spectrum from statehood to Commonwealth status to independence.
We think it unnecessary to plumb these questions, whether of preconditions to suit or the meaning of the treaties, because none of these treaties comprises domestic law of the United States and so their status furnishes the clearest ground for denying declaratory relief. It is well settled that declaratory relief is discretionary, Wilton v. Seven Falls Co., 515 U.S. 277, 287, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995), but discretion does not mean anything that a judge feels like doing. Rather,
the discretion to grant declaratory relief is to be exercised with great circumspection when matters of public moment are involved, ... or when a request for relief threatens to drag a federal court prematurely into constitutional issues that are freighted with uncertainty.
Ernst & Young v. Depositors Economic Protection Corp., 45 F.3d 530, 535 (1st Cir.1995).
It would not be “circumspection” but patent imprudence to “declare” pur *150 ported rights under the treaties at issue in this case. The United States has signed numerous treaties over the years, many containing highly general and ramifying statements. Some as negotiated by the President are merely aspirational and not law in any sense. Others may comprise international commitments, but they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be “self-executing” and is ratified on these terms. The law to this effect is longstanding. See Whitney v. Robertson, 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888); Foster v. Neilson, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829) (Marshall, C.J.).
The treaties in question here do not adopt any legal obligations binding as a matter of domestic law. The Universal Declaration of Human Rights is precatory: that is, it creates aspirational goals but not legal obligations, even as between states. Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 2767, 159 L.Ed.2d 718 (2004). This is also true of the Inter-American Democratic Charter.[6] The final instrument, the International Covenant on Civil and Political Rights, is a ratified treaty but was submitted and ratified on the express condition that it would be “not self-executing.” 138 Cong. Rec. S4781, S4784 (daily ed. Apr. 2, 1992). Indeed, Sosa used it as an example of such a treaty, saying:
Several times, indeed, the Senate has expressly declined to give the federal courts the task of interpreting and applying international human rights law, as when its ratification of the International Covenant on Civil and Political Rights declared that the substantive provisions of the document were not self-executing.
124 S.Ct. at 2763.
Whatever limited room there may be for courts to second-guess the joint position of the President and the Senate that a treaty is not self-executing — and we are pretty skeptical of such a suggestion in light of “the discretion of the Legislative and Executive Branches in managing foreign affairs,” id. — it is certainly not present in a case in which the Supreme Court has expressed its own understanding of a specific treaty in the terms block quoted above. Indeed, only a few pages later Sosa repeated: “[T]he United States ratified the Covenant on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts.” Id. at 2767.
When the President negotiates a preca-tory agreement or a non-self-executing treaty, and when Congress refuses to adopt implementing legislation for a non-self-executing treaty, both are performing functions entrusted to them by the Constitution. U.S. Const, art. I, §§ 1, 8-10; art. II, §§ 2-3. It would ignore, and undermine, this constitutional allocation of functions for a federal court to declare that the United States was nevertheless “violating” such a treaty. In substance, such an exercise would attempt to do what the President and Congress have declined to do, namely, to deploy the treaty provision in an attempt to order domestic arrangements within the United States.
*151 This intrusive course could also embarrass the United States in the conduct of its foreign affairs, which is “committed by the Constitution to the executive and legislative- — ‘the political’ — departments of the government.” Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918). Whatever the State Department might later say, such a declaration by a federal court of a supposed “treaty obligation” could be trumpeted as propaganda in international bodies and elsewhere. This is a legitimate concern in considering whether “discretion” should be exercised to grant declaratory relief.[7] Of course, no such declaration would confer a presidential vote on Igartúa: it would merely reinforce the disturbing view that judges have no proper notion of where their own authority ends.
The case for giving Puerto Ricans the right to vote in presidential elections is fundamentally a political one and must be made through political means. But the right claimed cannot be implemented by courts unless Puerto Rico becomes a state or until the Constitution is changed (as it has been, at least five times, to broaden the franchise). U.S. Const, amend. ,XV (race, color, previous servitude); id. amend. XIX (sex); id. amend. XXIII (District of Columbia); id. amend. XXIV (payment of poll or other tax); id. amend. XXVI (age eighteen and older). It certainly should not be “declared” by a federal court on the basis of treaties none of which was designed to alter domestic law — and none of which could override the Constitution.
Little need be said of Igartúa’s related claim that customary international law, by itself and independent of treaties, requires that he be allowed to vote for President. Although sometimes said by enthusiasts to be law like other law, customary international law is a diffuse and often highly uncertain body of norms whose force and enforceability vary greatly even in the international sphere; and its status in our domestic courts is even more qualified. See Sosa, 124 S.Ct. at 2762-63, 2768-69.
Only recently, in Sosa, the Supreme Court enjoined great caution in importing such norms into domestic law, even in the context of a federal statute governing alien tort actions that arguably authorized some degree of importation by federal courts. Sosa refused to recognize as a norm of customary international law the notion of protection against arbitrary arrest. 124 S.Ct. at 2769. Yet the claim rejected in Sosa was a model of precision compared to Igartúa’s present claim.
No serious argument exists that customary international law, independent of the treaties now invoked, requires a particular form of representative government. Practice among leading democratic nations shows a diversity as to how governments organize and structure the franchise; in Great Britain, for example, neither the head of state nor of government is directly elected by the public at large. If there exists an international norm of democratic government, it is at a level of generality so high as to be unsuitable for importation into domestic law. Sosa, 124 S.Ct. at 2768 n. 27.
*152 Finally, other supporters of Igartúa’s claim suggest that the United States need not “amend the Constitution” to resolve the asserted infirmity of having Puerto Ricans classed as citizens of the United States but unable to vote for President. For example, Puerto Rico could be made a state or, alternatively, could be recognized as an independent nation. Granting the declaration, it is claimed, would encourage the United States to “take steps” toward a resolution even if it did not immediately secure a vote for Igartúa.
This is, of course, nothing but speculation, but it further underscores the impropriety of the judicial declaration sought. The main impact of such an abstract declaration, if any, would be to serve partisans in a political campaign as to the choice between statehood, independence, Commonwealth status, or other altered arrangements between Puerto Rico and the United States. Changes to the Constitution and the present status of Puerto Rico are not the province of federal judges, nor are they dictated by international law; those changes can only be adopted as set forth in the Constitution and laws of the United States.

Affirmed.

. Igartua De La Rosa v. United States, 32 F.3d 8 (1st Cir.1994) (“Igartúa I"); Igartua De La Rosa v. United States, 229 F.3d 80 (1st Cir.2000) ("Igartúa II"); Igartúa-De La Rosa v. United States, 386 F.3d 313 (1st Cir.2004) ("Igartúa III"). The panel in Igartúa III vacated its own decision and granted panel rehearing, 404 F.3d 1 (1st Cir.2005); and this court then granted en banc review, 407 F.3d 30 (1st Cir.2005).

. The first two of the three documents are not “treaties” in the constitutional sense, being instead aspirational documents never submitted by the President for Senate ratification. U.S. Const, art. II, § 2, cl. 2. Neither is listed in the State Department’s current "treaties in force” list. U.S. Department of State, Treaties in Force 2004, at www.state. gov/s/I/3 8294.htm. For convenience, we ignore the distinction because it does not affect the result in this case.

. See United States v. Li, 206 F.3d 56, 60-61 (1st Cir.2000) (en banc) ("[T]reaties do not generally create rights that are privately enforceable in the federal courts” (citing Head Money Cases, 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884)); id. at 61 ("presumption against private rights of action under international treaties”).

. Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (unless injury is "likely to be redressed by a favorable decision,” federal court’s exercise of power "would be gratuitous and thus inconsistent with the Art. Ill limitation”); Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)(re-dressability must not be "speculative”). See also Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 103-04, 103 n. 5, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (redressability at "core” of Article III).

.See G.A. Res. 748 (VIII), U.N. GAOR, 8th Sess., 459th píen. mtg. at 26 (1953) (United Nations General Assembly, upon formation of "political association” between United States and Puerto Rico, "[r]ecognizes that the people of the Commonwealth of Puerto Rico, by expressing their will in a free and democratic way, have achieved a new constitutional status” and “that, when choosing their constitutional and international status, the people of the Commonwealth of Puerto Rico have effectively exercised their right to self-determination”).

. See Remarks of U.S. Ambassador Roger Noriega at Organization of American States Permanent Council Meeting (Sept. 6, 2001), in Digest of United States Practice in International Law: 2001 at 347, Office of the Legal Advisor, U.S. Department of State (Sally J. Cummins & David P. Stewart eds., 2001) ("[T]he United Stales understands that this Charter does not establish any new rights or obligations under either domestic or international law.”).

. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 412, 431-33, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (weighing possibility of “embarrassment to the Executive Branch in handling foreign affairs”); Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (“potentiality of embarrassment from multifarious pronouncements by various departments on one question” relevant to justi-ciability). See also United States v. Lee, 106 U.S. 196, 209, 1 S.Ct. 240, 27 L.Ed. 171 (1882).