# In the
# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 06-2218, 06-2317

WILLIAM CRAWFORD, *et al.*,

*Plaintiffs-Appellants*,

*v.*

MARION COUNTY ELECTION BOARD, *et al.*,

*Defendants-Appellees*.

———————————

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:05-cv-00634-SEB-VES—**Sarah Evans Barker**, *Judge*.

———————————

ARGUED OCTOBER 18, 2006—DECIDED JANUARY 4, 2007

———————————

Before POSNER, EVANS, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. A number of candidates for public office, and voters, along with organizations such as the Democratic Party that are active in electoral politics, challenge a new Indiana voting law as an undue burden on the right to vote, a right that the Supreme Court has found latent in the Constitution. E.g., *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979), and cases cited in *Igartua-De La Rosa v. United States*, 417 F.3d 145, 169-70 (1st Cir. 2005). The law requires, with certain exceptions, that persons wanting to vote in person

in either a primary or a general election must present at the polling place a government-issued photo ID (see Ind. Code § 3-5-2-40.5), Ind. Code §§ 3-10-1-7.2, 3-11-8-25.1), unless the person either wants to vote by absentee ballot (and is eligible to do so) or lives in a nursing home. Ind. Code §§ 3-11-8-25.1(e), 3-11-10-1.2. The district court granted summary judgment for the defendants. *Indiana Democratic Party v. Rokita,* 2006 U.S. Dist. LEXIS 20321 (N.D. Ind. Apr. 14, 2006).

Until the new law went into effect, someone who wanted to vote in person and was not voting for the first time just had to sign the poll book at the polling place; "there would generally be a photographic copy of the signature [on file] that would be compared" by the staff with the signature in the poll book. *Id.* at *18-*19. The new law's requirement that the would-be voter present a government-issued photo ID, such as a passport or a driver's license, is no problem for people who have such a document, as most people do. Nor is it a problem for people who vote by absentee ballot or who live in nursing homes—and anyone 65 or over can vote by absentee ballot. But what about people who do not have photo IDs and must vote in person, if they vote at all, because they don't live in nursing homes and are ineligible to cast absentee ballots, though the eligibility requirements are not stringent (see Ind. Code § 3-11-10-24, and compare *Griffin v. Roupas,* 385 F.3d 1128, 1129 (7th Cir. 2004), discussing the Illinois requirements)? They can get a photo ID from the Indiana motor vehicle bureau by presenting their birth certificate (or certificate of naturalization if they were born outside the United States) or a certified copy, plus a document that has their name and address on it, such as a utility bill. Both the indigent and

the nonindigent who does not have (or have with him) a photo ID can, if challenged, cast a provisional ballot and then has 10 days either to file an indigency affidavit or to procure a photo ID. Ind. Code §§ 3-11.7-5-2.5, 3-11-8-23, 3-11-8-25.1.

Even though it is exceedingly difficult to maneuver in today's America without a photo ID (try flying, or even entering a tall building such as the courthouse in which we sit, without one; see *United States v. Smith*, 426 F.3d 567 (2d Cir. 2005)), and as a consequence the vast majority of adults have such identification, the Indiana law will deter some people from voting. A great many people who are eligible to vote don't bother to do so. Many do not register, and many who do register still don't vote, or vote infrequently. The benefits of voting to the individual voter are elusive (a vote in a political election rarely has any *instrumental* value, since elections for political office at the state or federal level are never decided by just one vote), and even very slight costs in time or bother or out-of-pocket expense deter many people from voting, or at least from voting in elections they're not much interested in. So some people who have not bothered to obtain a photo ID will not bother to do so just to be allowed to vote, and a few who have a photo ID but forget to bring it to the polling place will say what the hell and not vote, rather than go home and get the ID and return to the polling place.

No doubt most people who don't have photo ID are low on the economic ladder and thus, if they do vote, are more likely to vote for Democratic than Republican candidates. Exit polls in the recent midterm elections show a strong negative correlation between income and voting Democratic, with the percentage voting Democratic rising

from 45 percent for voters with an income of at least $200,000 to 67 percent for voters having an income below $15,000. "Exit Polls," http://www.cnn.com/ELECTION/2006/pages/results/states/US/H/00/epolls.0.html; see also Jeffrey M. Stonecash, *Class and Party in American Politics* 114 (2000) (tab. 5.7). Thus the new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote. See *Havens Realty Corp v. Coleman*, 455 U.S. 363, 378 (1982); *Smith v. Boyle*, 144 F.3d 1060, 1061-63 (7th Cir. 1998). The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC),* Inc., 528 U.S. 167, 180-84 (2000); *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 690 n. 14 (1973); *520 Michigan Avenue Associates, Ltd. v. Devine*, 433 F.3d 961, 962-63 (7th Cir. 2006); *Baur v. Veneman*, 352 F.3d 625, 633-34 (2d Cir. 2003). The Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new law. *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 573-74 (6th Cir. 2004); see also *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

The standing of the many other plaintiffs in these consolidated suits—candidates, voters, organizations—is less certain, but need not be addressed. Only injunctive relief is sought, and for that only one plaintiff with standing is required; and the Democratic Party has standing. *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 585-86 (5th Cir. 2006); *Schulz v. Williams*, 44 F.3d 48, 50-53 (2d Cir. 1994); *Owen v. Mulligan*, 640 F.2d 1130, 1131-33 (9th Cir. 1981); see

*Libertarian Party v. Rednour*, 108 F.3d 768, 770 (7th Cir. 1997).

But there is something remarkable about the plaintiffs considered as a whole, which will provide the transition to our consideration of the merits. There is not a single plaintiff who intends not to vote because of the new law—that is, who would vote were it not for the law. There are plaintiffs who have photo IDs and so are not affected by the law at all and plaintiffs who have no photo IDs but have not said they would vote if they did and so who also are, as far as we can tell, unaffected by the law. There thus are no plaintiffs whom the law will deter from voting. No doubt there are at least a few such people in Indiana, but the inability of the sponsors of this litigation to find any such person to join as a plaintiff suggests that the motivation for the suit is simply that the law may require the Democratic Party and the other organizational plaintiffs to work harder to get every last one of their supporters to the polls.

The fewer the people who will actually disfranchise themselves rather than go to the bother and, if they are not indigent and don't have their birth certificate and so must order a copy and pay a fee, the expense of obtaining a photo ID, the less of a showing the state need make to justify the law. The fewer people harmed by a law, the less total harm there is to balance against whatever benefits the law might confer. The argument pressed by the plaintiffs that any burden on the right to vote, however slight it is or however meager the number of voters affected by it, cannot pass constitutional muster unless it is shown to serve a compelling state interest was rejected in *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992). The Court said that "election laws will invariably impose some

burden upon individual voters. . . . [T]o subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently." See also *Anderson v. Celebrezze*, 460 U.S. 780, 788-90 (1983), where the Court pointed to the need to "consider the character and *magnitude* of the asserted injury" (emphasis added); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *Storer v. Brown*, 415 U.S. 724, 730 (1974); *Schulz v. Williams*, 44 F.3d 48, 56 (2d Cir. 1994).

A strict standard would be especially inappropriate in a case such as this, in which the right to vote is on both sides of the ledger. See *Purcell v. Gonzalez*, 127 S. Ct. 5, 7 (2006) (per curiam); cf. *Burson v. Freeman*, 504 U.S. 191, 198, 206, 211 (1992). The Indiana law is not like a poll tax, where on one side is the right to vote and on the other side the state's interest in defraying the cost of elections or in limiting the franchise to people who really care about voting or in excluding poor people or in discouraging people who are black. The purpose of the Indiana law is to reduce voting fraud, and voting fraud impairs the right of legitimate voters to vote by diluting their votes—dilution being recognized to be an impairment of the right to vote. *Purcell v. Gonzalez*, *supra*, 127 S. Ct. at 7; *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *Siegel v. LePore*, 234 F.3d 1163, 1199 (11th Cir. 2000). On one side of the balance in this case is the effect of requiring a photo ID in inducing eligible voters to disfranchise themselves. That effect, so far as the record reveals, is slight. The principal evidence on which the plaintiffs relied to show that many voters would be disfranchised was declared by the district judge

to be "totally unreliable" because of a number of method-
ological flaws; and we accept her finding.

On the other side of the balance is voting fraud, specifi-
cally the form of voting fraud in which a person shows up
at the polls claiming to be someone else—someone who
has left the district, or died, too recently to have been
removed from the list of registered voters, or someone
who has not voted yet on election day. Without requiring
a photo ID, there is little if any chance of preventing this
kind of fraud because busy poll workers are unlikely to
scrutinize signatures carefully and argue with people
who deny having forged someone else's signature. The
plaintiffs point out that voting fraud is a crime, see, e.g.,
Ind. Code 3-14-2-12, and they argue that the penalty (six
months to three years in prison plus a fine of up to $10,000,
Ind. Code § 35-50-2-7) should suffice to deter the crime.
They further note that as far as anyone knows, no one in
Indiana, and not many people elsewhere, are known to
have been prosecuted for impersonating a registered voter.

But the absence of prosecutions is explained by the
endemic underenforcement of minor criminal laws (minor
as they appear to the public and prosecutors, at all events)
and by the extreme difficulty of apprehending a voter
impersonator. He enters the polling place, gives a name
that is not his own, votes, and leaves. If later it is discov-
ered that the name he gave is that of a dead person, no
one at the polling place will remember the face of the
person who gave that name, and if someone did remember
it, what would he do with the information? The imperson-
ator and the person impersonated (if living) might show
up at the polls at the same time and a confrontation might
ensue that might lead to a citizen arrest or a call to the
police who would arrive before the impersonator had

fled, and arrest him. A more likely sequence would be for the impersonated person to have voted already when the impersonator arrived and tried to vote in his name. But in either case an arrest would be most unlikely (and likewise if the impersonation were discovered or suspected by comparing signatures, when that is done), as the resulting commotion would disrupt the voting. And anyway the impersonated voter is likely to be dead or in another district or precinct or to be acting in cahoots with the impersonator, rather than to be a neighbor (precincts are small, sometimes a single apartment house). One response, which has a parallel to littering, another crime the perpetrators of which are almost impossible to catch, would be to impose a very severe criminal penalty for voting fraud. Another, however, is to take preventive action, as Indiana has done by requiring a photo ID.

The plaintiffs argue that while vote fraud by impersonation may be a problem in other states, it is not in Indiana, because there are no reports of such fraud in that state. But that lacuna may reflect nothing more than the vagaries of journalists' and other investigators' choice of scandals to investigate. Some voter impersonation has been found (though not much, for remember that it is difficult to detect) in the states that have been studied, and those states do not appear to be on average more "dishonest" than Indiana; for besides the notorious examples of Florida and Illinois, they include Michigan, Missouri, and Washington (state). Indirect evidence of such fraud, or at least of an acute danger of such fraud, in Indiana is provided by the discrepancy between the number of people listed on the registered-voter rolls in the state and the substantially smaller number of people actually eligible to vote. The defendants' expert estimated that the registration rolls

contained 1.3 million more names than the eligible voters in Indiana. This seems too high, but the plaintiffs' expert acknowledged that the rolls are inflated. How many impersonations there are we do not know, but the plaintiffs have not shown that there are fewer impersonations than there are eligible voters whom the new law will prevent from voting.

The plaintiffs point out that the National Voter Registration Act of 1993, 42 U.S.C. § 1973gg-6(a)(4), requires all states to purge their registration rolls of ineligible voters. See also the Help American Vote Act, 42 U.S.C. § 15301, particularly § 15483(a)(4)(B). The purge has not yet been completed in Indiana. One thing that is slowing it down is that removing a name from the voter registration roll requires notice to a registered voter whose address appears from postal records to have changed, and only if a voter fails to respond to the notice and fails to vote in two successive federal elections can the state remove him from the rolls. 42 U.S.C. §§ U.S.C. §1973gg-6(c), (d). And when the purge *is* completed, it is likely to eliminate many more eligible voters than the new Indiana law will do, cf. Jeffrey A. Blomberg, "Note: Protecting the Right Not to Vote From Voter Purge Statutes," 64 *Fordham L. Rev*. 1015, 1016-17 (1995), yet provide only a short-term solution, since as soon as the purge is complete the inflation of the registration rolls will recommence.

The plaintiffs complain that the new Indiana law is underinclusive because it fails to require absentee voters to present photo IDs. But how would that work? The voter could make a photocopy of his driver's license or passport or other government-issued identification and include it with his absentee ballot, but there would be no way for the state election officials to determine whether

the photo ID actually belonged to the absentee voter, since he wouldn't be presenting his face at the polling place for comparison with the photo. Cf. *Griffin v. Roupas, supra*, 385 F.3d at 1130-31.

Perhaps the Indiana law can be improved—what can't be?—but the details for regulating elections must be left to the states, pursuant to Article I, section 4, of the Constitution, which provides that "the times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of choosing Senators." "To deem ordinary and widespread burdens like these severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes. The Constitution does not require that result, for it is beyond question 'that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and  campaign-related disorder.'" *Clingman v. Beaver*, 544 U.S. 581, 593 (2005), quoting the *Timmons* case cited earlier; see also *Anderson v. Celebrezze, supra*, 460 U.S. at 788; *Griffin v. Roupas, supra*, 385 F.3d at 1130-31.

Regarding the plaintiffs' other arguments, we have nothing to add to the discussion by the district judge. The judgment for the defendants is

AFFIRMED.

EVANS, *Circuit Judge*, dissenting.  Let's not beat around the bush: The Indiana voter photo ID law is a not-too-thinly-veiled attempt to discourage election-day turnout by certain folks believed to skew Democratic. We should subject this law to strict scrutiny—or at least, in the wake of *Burdick v. Takushi*, 504 U.S. 428 (1992), something akin to "strict scrutiny light"—and strike it down as an undue burden on the fundamental right to vote.

The percentage of eligible voters participating in elections has, for many years, been on a downward trajectory. With that being the case, one would think states should be looking for creative ways (like allowing people to vote at places they frequent and are familiar with, like shopping malls rather than basements of fire stations) to increase voter participation. Yet, the Indiana law we sanction today does just the opposite. Constricting the franchise in a democratic society, when efforts should be instead undertaken to expand it, is not the way to go.

The fig leaf of respectability providing the motive behind this law is that it is necessary to prevent voter fraud—a person showing up at the polls pretending to be someone else. But where is the evidence of that kind of voter fraud in this record? Voting fraud is a crime (punishable by up to 3 years in prison and a fine of up to $10,000 in Indiana) and, at oral argument, the defenders of this law candidly acknowledged that no one—in the history of Indiana—had ever been charged with violating that law. Nationwide, a preliminary report to the U.S. Election Assistance Commission has found little evidence of the type of polling-place fraud that photo ID laws seek to stop. If that's the case, where is the justification for this law? Is it wise to use a sledgehammer to hit either a real or imaginary fly on a glass coffee table? I think not.

Indiana law provides that a voter shall be challenged at the poll and required to vote only by provisional ballot if: (1) "the voter is unable or declines to present the Proof of Identification or (2) a member of the precinct election board determines that the Proof of Identification provided by the voter does not qualify as Proof of Identification under the law. "Proof of Identification" is defined as a document that satisfies all the following:

(1) The document shows the name of the individual to whom the document was issued, and the name conforms to the name in the individual's voter registration record.

(2) The document shows a photograph of the individual to whom the document was issued.

(3) The document includes an expiration date, and the document:

(A) is not expired; or

(B) expired after the date of the most recent general election.

(4) The document was issued by the United States or the State of Indiana.

The potential for mischief with this law is obvious. Does the name on the ID "conform" to the name on the voter registration list? If the last name of a newly married woman is on the ID but her maiden name is on the registration list, does it conform? If a name is misspelled on one—Schmit versus Schmitt—does it conform? If a "Terence" appears on one and a shortened "Terry" on the other, does it conform?

But these are perhaps minor concerns. The real problem is that this law will make it significantly more difficult for

some eligible voters—I have no idea how many, but 4 percent is a number that has been bandied about—to vote. And this group is mostly comprised of people who are poor, elderly, minorities, disabled, or some combination thereof. I would suspect that few, if any, in this class have passports (which cost in the neighborhood of $100), and most don't have drivers licenses (who needs a drivers license if you don't drive a car?) or state-issued ID cards which require valid (certified) birth certificates. And it's not particularly easy for a poor, elderly person who lives in South Bend, but was born in Arkansas, to get a certified copy of his birth certificate.

Now I certainly agree with my brother Posner that "it is exceedingly difficult to maneuver in today's America without a photo ID." But Indiana's law mostly affects those who, for various reasons, lack any real maneuverability at all. And lest one thinks that those who have maneuverability are immune from running into trouble with this law, consider this anecdotal tidbit.

The *Washington Post* (Nov. 3, 2006) reported that on Indiana's primary election day, Rep. Julia Carson[1] shoved her congressional identification card in a pocket, ran out of her house and raced down the street to be at her polling site when it opened at 6 a.m. Carson, seeking to represent an Indianapolis district for a sixth term, showed the card to a poll worker, who said it was unacceptable under a

---

[1] Ultimately, Carson, a Democrat, won her seat with a 54-46 advantage over her Republican opponent. Although it was not in the Hoosier state, Mark Sanford, the Republican governor of South Carolina, was prevented from voting last month when he showed up at his polling station without the correct ID to vote.

new state law that requires every voter to show proof of identity with a certain type of photo ID. But Carson, after being turned away, went home and later returned to their polling places to cast her vote. Would most people, especially those without a vested interest in the system, do the same thing? I doubt it.

I believe that most of the problems with our voting system—like deceased persons or felons on registration rolls, machines that malfunction, and confusing ballots (think butterfly)—are suggestive of mismanagement, not electoral wrongdoing. And I recognize that there is, and perhaps there may always be, a fundamental tension between claims of voter fraud and fears of disenfranchisement. But Indiana's law, because it allows nothing except a passport or an Indiana ID card to prove that a potential voter is who he says he is, tips far too far in the wrong direction.

*Burdick*, which concerned a challenge to a Hawaii law that did not require the counting of write-in votes, put to rest the notion that strict scrutiny applies to every law that imposes a burden on the right to vote. As the Court observed:

> [T]o subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently . . . .
>
> Instead, . . . [a] court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise inter-

ests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 433-34 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 213-14 (1986).

So *Burdick* adopts a flexible standard, and as I read it, strict scrutiny may still be appropriate in cases where the burden, as it is here, is great and the state's justification for it, again as it is here, is hollow. At the very least, I would apply a standard here that would at least be something close to "strict scrutiny light." Applying that standard, I would conclude that Indiana's law imposes an undue burden on a recognizable segment of potential eligible voters and that it therefore violates those voters' rights under the First and Fourteenth Amendments to the Constitution.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*