ROGERS, J., delivered the opinion of the court, in which COOK, J., joined. COLE, C.J., (pp. 461-64), delivered a separate dissenting opinion.
OPINION
ROGERS, Circuit Judge.
This case concerns whether an organization conducting voter outreach has standing to challenge the deadline for requesting an absentee ballot, on the theory that this deadline — 6:00 P.M. on the Friday before Election Day — prevents people jailed after the deadline and held through Election Day from exercising their right to vote. In order to sue in federal court, an organizational plaintiff must show a concrete and particularized injury in fact to itself or its members. Plaintiffs have not done so here. Further, limits on third-party standing prevent the organizational plaintiffs in this case from asserting the rights of third-parties.
Under Ohio law, jail confinement does not negate voter eligibility. Persons who are in jail on pending charges have the right to register and vote. Ohio Rev.Code § 3509.08(A). Only convicted felons in state custody lose the right to vote, and only during the pendency of their incarceration. Ohio Rev.Code § 2961.01(A).
Ohio law provides two basic methods by which a registered voter can cast a ballot: by voting in person at an assigned location on Election Day, or by using one of the “absent voter’s ballot procedures” found in Ohio Rev.Code § 3509.01 et seq. Ohio law and practice provide for five methods of absentee voting. First, one can vote remotely by mail. Second, one can vote early, in person, at the board of elections or other designated location. The final three ways apply to those in special circumstances, that is, overseas uniformed military, those subject to “disability or confinement,” or those in “unforeseen hospitalization.”
For conventional absentee voting, a request must be received by hand delivery before 6:00 P.M. on the Friday before Election Day, or by mail before noon on the Saturday before Election Day at the relevant board of elections. Ohio Rev. Code § 3509.03. Those in special circumstances, including those confined under a sentence for a misdemeanor or awaiting trial on a felony or misdemeanor, cap submit ballot applications up to 90 days before an election. Ohio Rev.Code § 3509.08(A). After receiving and verifying confined voter ballot applications, boards of elections send two-person teams to obtain the ballots from those confined at nursing homes, private homes, hospitals, and jails. While such teams visit nursing homes as long as a month before the election, boards of elections can and do wait until Election Day to send a team to the county’s jail or jails, to avoid obtaining absentee ballots from persons who would have been released before Election Day.
The practical outcome of the current procedure is that persons jailed after 6:00 P.M. on the Friday before Election Day who are not released in time to vote in person on Election Day and who have not already voted using one of the other absent voter ballot procedures are unable to vote.
Separate from the ordinary absentee ballot procedures, those who cannot visit the polls in person because the voter or the voter’s minor child is “confined in a hospital as a result of an accident or un *459 foreseeable medical emergency” can qualify for a special voting procedure if an absentee ballot application is delivered to the relevant board of elections by 3:00 P.M. on Election Day. Ohio Rev.Code § 3509.08(B)(1). A late hospital voter can request that the absentee ballot be entrusted to a family member for delivery. Otherwise, the board must send a two-person team of board employees representing the two major political parties. Ohio Rev.Code § 3509.08(B). No corresponding provision exists for persons confined in jail on Election Day because of an arrest or misdemeanor conviction occurring after 6:00 P.M. the preceding Friday.
Plaintiffs initiated this suit on October 15, 2012 by filing a complaint and a motion for a temporary restraining order. Plaintiffs alleged that treating late jailed electors differently from late-hospitalized electors violates the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment, § 2 of the Voting Rights Act, and the Seventeenth Amendment. They requested declaratory and injunctive relief. After' an oral hearing on the motion, the district court determined that at least one of the plaintiffs — The AMOS Project — had standing to sue because it would be “required to divert its resources to retraining its volunteers and informing its members and constituents of the risks attendant with getting arrested during the weekend prior to the election.” The district court then found that the plaintiffs were not likely to succeed on any of their claims and that equitable factors weighed against issuing a temporary restraining order. The plaintiffs did not appeal, and the parties proceeded with discovery.
The parties then filed cross-motions for summary judgment. In a ruling on September 16, 2014, the district court again found that AMOS had standing to sue. The court noted that standing had already been found when the plaintiffs filed for a temporary restraining order. The court found that the evidence produced on summary judgment showed that “AMOS learned of the disenfranchisement of late jailed voters late in the game, and therefore weren’t able to modify voting rights placards or print new supplemental materials,” and that “AMOS used its small staff in voter engagement training to teach election volunteers that a pre-election arrest could result in the loss of the chance to vote.” According to the district court, these showings of injury were enough for AMOS to have standing. The court then granted summary judgment for the plaintiffs on all of their claims.
Although the district court’s constitutional analysis does not appear sufficient to warrant the injunction, we need not address the merits. AMOS lacks standing because it has not shown that it has suffered an injury in fact. To establish standing, AMOS must show an injury in fact, fairly traceable to the defendant’s conduct, that is likely to be redressed by a favorable decision from the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Each element of standing “must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at successive stages of the litigation.” Id. at 561, 112 S.Ct.. 2130. AMOS made two evidentiary showings on summary judgment, neither of which establishes an injury in fact. That AMOS’s placards and supplemental materials failed to contain a full and accurate description of the years-old late jailed electors issue is not an Article III injury, and even if it were, it is not fairly traceable to the State, only to AMOS’s ignorance of the law. Further, it is not an injury to *460 instruct election volunteers about absentee voting procedures when the volunteers are being trained in voting procedures already, as AMOS Executive Director Paul Graham conceded that the training was part of a single regularly scheduled meeting. And even if this instruction were an injury, any likely redress by this court would simply substitute a different procedure, which AMOS must teach its volunteers instead.
The only other basis for standing offered by the plaintiffs is that the law compelled AMOS to divert limited resources to address the issue of late-jailed electors, but the plaintiffs have not supported this argument with specific facts apart from the two evidentiary showings.[1] Lujan teaches that “mere allegations” are insufficient to establish jurisdiction; at summary judgment, plaintiffs must set forth “specific facts.” 504 U.S. at 561, 112 S.Ct. 2130. If such specific facts are in the record, the plaintiffs have not pointed them out on appeal. Instead, plaintiffs rest on the conclusions reached by the district court, content to quote broadly from the district court’s denial of a temporary restraining order and grant of summary judgment. These conclusions, taken separately or together, do not amount to a diversion of resources and do not constitute Article III injuries.
At bottom the Article III standing limitation prevents a plaintiff from bringing a federal suit to resolve an issue of public policy if success does not give the plaintiff (or one of an associational plaintiffs members) some relief other than the satisfaction of making the government comply with the law. The relief need not be monetary, of course. It may for instance be aesthetic, or informational. If a voter can get to the polls more easily by winning the lawsuit, or a political party can marshal its forces more effectively by winning its lawsuit, that ought to be enough for Article III. But if the armchair observer decides that the government is violating the law, and decides to stop it by suing, that is not enough. This limit would be eviscerated if an advisor or organization can be deemed to have Article III standing merely by virtue of its efforts and expense to advise others how to comport with the law, or by virtue of its efforts and expense to change the law. Plaintiffs in this case have demonstrated no more than this.
The cases cited by the Plaintiffs in support of their diversion of resources theory of standing are accordingly distinguishable. In Crawford v. Marion County *461 Election Board, the Seventh Circuit concluded that the Democratic Party had standing to challenge an Indiana voter ID law. 472 F.3d 949 (7th Cir.2007). The law injured the Democratic Party by preventing and discouraging Democratic Party members and supporters from voting. Id. at 951. In Florida State Conference of the NAACP v. Browning, the Eleventh Circuit found that the NAACP and other organizations had standing to challenge a Florida law that required voter registration information to match information in state databases. 522 F.3d 1153 (11th Cir.2008). The Eleventh Circuit concluded that the organizations had standing on behalf of their members. Id. at 1163-64. Under the law, if the information did not match, the voter-members would have to take additional steps to correct the error, such as providing documentary proof that the state databases were incorrect or filing an amended voter registration form. Id. at 1157. In Browning, the NAACP and other organizations had standing because at least some of their approximately 20,000 members would have had their voter registration applications rejected due to a mismatch. Id. at 1163. Unlike in Crawford and Browning, there is simply no indication that any of AMOS’s members will be a voter affected by the challenged law. Instead, the law purportedly injures AMOS by hampering AMOS’s abstract social interest in maximizing voter turnout. Harm to abstract social interests cannot confer Article III standing. Greater Cincinnati Coal, for the Homeless v. City of Cincinnati, 56 F.3d 710, 716-17 (6th Cir.1995).
Even if AMOS were to demonstrate it has Article III standing, it would confront the additional barrier of the long-recognized limit on plaintiffs asserting the rights of third-parties.[2] The plaintiffs are organizations and cannot vote; instead they assert the right to vote of individuals not even presently identifiable. A party “generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.” Kowalski v. Tesmer, 543 U.S. 125, 129, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004). There are exceptions to this limit — such as where a “close relationship” exists between the party asserting the right and the party possessing it or where a “hindrance” exists to the possessor’s ability to protect the right, id. at 129-30, 125 S.Ct. 564 — but none applies here. The relationship between AMOS and the persons whom it seeks to help — unidentified, future late jailed voters — does not resemble the close relationship of the lawyer-client or doctor-patient relationships recognized by the Supreme Court. Id.
In their brief, the Plaintiffs do not identify any other basis for standing. Plaintiffs accordingly lack standing to sue.
For these reasons we vacate the judgment of the district court, and remand with instructions to dismiss.

. The dissent’s reliance on Havens Realty Corporation v. Coleman is misplaced. 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). First, in Havens, the plaintiff organization sought damages, not an injunction, id. at 378, 102 S.Ct. 1114; damages are a classic basis for standing. And as the Supreme Court later held in City of Los Angeles v. Lyons, plaintiffs who have standing to bring a damages claim do not necessarily have standing to bring a claim for injunctive relief. 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Second, ■the injury to the plaintiff organization in Havens was a distinct and palpable injury to a broad legal right intrinsic to the organization’s activities. In Havens, the right under the Fair Housing Act was “an enforceable right [of any person] to truthful information concerning the availability of housing,” 455 U.S. at 373, 102 S.Ct. 1114 — a right that cuts to the core of an organization that "provide[d] counseling and referral services for low-and moderate-income homeseekers,” id. at 379, 102 S.Ct. 1114. The misinformation provided by the Havens defendants, i.e. a lie told to black renters, including a member of - the organization, that no rental units were available, directly interfered with the organization’s ability to provide truthful counseling and referral services. The present case does not involve false information. For similar reasons, the dissent’s reliance on Miami Fair Housing Center, Inc. v. Connor Group, 725 F.3d 571 (6th Cir.2013), also an'FHA suit for damages, id. at 576, is misplaced.

. Husted does not specifically raise the limit on third-party standing, but this court has previously held that such limits on standing may be raised by the court. Cmty. First Bank v. Nat'l Credit Union Admin., 41 F.3d 1050, 1053 (6th Cir. 1994), amended (May 8, 1995).