RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0037p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

McCORD HENRY, Personal Representative of the
Estate of Linda Henry,

     *Plaintiff-Appellant,*

     *v.*

MARTIN BLANK; TROY PACKARD; JAMES KOSIBOSKI;
MATTHEW WEAVER; BENZIE COUNTY, MICHIGAN,

     *Defendants-Appellees.*

No. 25-1713

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:25-cv-00113—Hala Y. Jarbou, District Judge.

Decided and Filed:  February 12, 2026

Before:  GILMAN, GRIFFIN, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ON BRIEF:** Jacob R. Goodman, Bailor Bell, Douglas E. Fierberg, THE FIERBERG
NATIONAL LAW GROUP, PLLC, Traverse City, Michigan, for Appellant.  Douglas J. Curlew,
CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellees.

─────────────────

## OPINION

─────────────────

RONALD LEE GILMAN, Circuit Judge.  In February 2022, Linda Henry (Henry) was
tragically murdered by her next-door neighbor, Jeffrey Stratton.  Her son, McCord Henry, acting
on behalf of his mother's estate (the Estate), sued Benzie County and certain deputies of its
Sheriff's Office (collectively, Defendants), alleging that Henry's murder was caused by

Defendants' selective denial of protective services when dealing with threats against women as compared to men. The Estate's complaint asserts claims based on Defendants' alleged violation of Henry's equal-protection rights under the United States Constitution and under Michigan's Elliott-Larsen Civil Rights Act.

The district court dismissed the Estate's federal claims for lack of standing and for failure to state a claim, and it declined to exercise supplemental jurisdiction over the Estate's state-law claims. In the instant appeal, the Estate challenges only the dismissal of its federal claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Jeffrey Stratton is a repeat criminal offender residing in rural Benzie County, Michigan. He has a long history of mental illness and violence occurring both inside and outside of the county. In the two years preceding Henry's murder, the Benzie County Sheriff's Office received at least 10 reports about Stratton's threatening behavior towards women and girls. The Estate alleges, however, that the Sheriff's Office failed to provide adequate protective services when responding to these reports, which ultimately resulted in Henry's death.

The first of these reports occurred on April 15, 2020, when Stratton's neighbor Michele Lonoconus warned emergency services that Stratton was experiencing a mental crisis, was suicidal, and was in possession of firearms. Two Sheriff's Office deputies visited Stratton's home and determined that he was "alive and well," but took no further action. An acquaintance of Stratton's then took him to the hospital for an overnight stay. As a result of the deputies' inaction, Lonoconus took protective measures into her own hands by removing Stratton's firearms from his home while he was gone.

Four days later, Lonoconus again reported Stratton to the police, stating that she was fleeing from him after he called her a "demon" and threatened her with a rifle. Sheriff's Office deputies Martin Blank and Matthew Weaver responded to the report, but instead of addressing Lonoconus's concerns, they returned Stratton's firearms to him. Following this incident, Weaver joked that Blank had given "a nuts guy back his guns lol," and remarked that "the women's

resource center is gonna complain again."  Blank responded, "suck it women lol," and Weaver suggested that the center should "eat a bag of dicks."

On January 31, 2022, a different neighbor of Stratton's, TW, reported that Stratton had sexually assaulted her minor daughter.  Michigan state police officers arrested Stratton, who was charged with criminal sexual conduct.  Stratton was released from custody three days later pursuant to a Pretrial Release Order, which forbade him from having direct or indirect contact with TW or her daughter.  The order stated that Stratton could be arrested without a warrant for violating any of its terms.

Stratton nevertheless continued his threatening behavior.  On February 3, 2022, Lonoconus informed the Sheriff's Office that Stratton was again acting erratically and dangerously.  In response, Deputy Blank said that he did not "want to deal with [Stratton's] crazy ass" and "cleared" the report by simply calling Stratton over the phone without checking on him in person.  Unsatisfied with the response by the Sheriff's Office, Lonoconus separately reported Stratton's behavior to Benzie County's mental-health service provider.  The provider then passed the report back to the Sheriff's Office, which did nothing but call Lonoconus and ask why she had made the report.

Later that evening, Stratton attempted to break into TW's home.  TW called 911, stating that Stratton was violating the conditions of his bond and that her daughter had armed herself with a firearm for protection.  Stratton was ultimately unable to enter the house and returned to his own residence.  When deputies James Kosiboski and Troy Packard from the Sheriff's Office arrived at the scene, Stratton had already left, but they observed footprints in the snow leading from TW's home to Stratton's front door.  Despite this evidence that Stratton had violated his release order, the deputies did not arrest him and instead told TW and her daughter that they were "all set for the night."  The Benzie County Prosecutor's Office subsequently moved to revoke Stratton's bond the following day, but the motion did not seek immediate emergency relief.

Stratton broke into the home of Henry, another one of his neighbors, in the afternoon of February 4, 2022.  Upon noticing that Stratton was approaching her house and acting strangely,

Henry called her son McCord, who immediately alerted emergency services. By the time deputies from the Sheriff's Office arrived at the scene, however, Stratton had murdered Henry by bashing her head and face, stabbing her repeatedly, and setting her on fire. Stratton was immediately arrested and charged with murder, but was ultimately found not guilty by reason of insanity.

The Estate alleges that the inadequate police response to the reports about Stratton—which culminated in Henry's death—were part of Benzie County's longstanding policy of providing inferior protective services in response to threats of violence against women as compared to men. The complaint goes on to detail several examples of such allegedly discriminatory treatment towards women.

One example involved TW, who reported in 2017 that a car full of men had forced her car off the road. The Sheriff's Office deputies, however, allegedly failed to take the report seriously and instead demanded that she remove a social-media post that she had made about the incident. In another instance in 2020, a woman called the police about a man who was threatening her at work, but the Sheriff's Office deputies failed to follow up with her. That same year, a female National Park Service ranger reported that a man in a black ski mask was menacing her in her driveway, yet the Sheriff's Office did not contact her until her male colleague requested special attention to the report. Even then, after Sheriff's Office deputies Blank and Weaver finally investigated, they concluded that the masked man was a former Sheriff's Office deputy named "Hutch," and they decided to simply "tell ranger \*\*\* that hutch was just messing around :)."

The complaint further claims that Henry herself had experienced discrimination by Benzie County and its Sheriff's Office. In 2010, Henry reported to Benzie County Animal Control that multiple chickens had been decapitated on her property, but county personnel failed to take any action in response. Two years later, Henry assisted a female Benzie County employee in bringing gender and race-discrimination charges related to the employee's job. Finally, in 2019, Henry experienced an attempted break-in at her home by Stratton. She immediately called her daughter-in-law, who suggested that Henry report the incident to the

police.  But Henry responded that she did not believe that the Sheriff's Office would help based on her past experiences.

In contrast to the lackluster response by the Sheriff's Office to threats against women, the complaint provides two examples of more robust responses when men were faced with danger. The first of these incidents occurred in 2019, when Sheriff's Office deputy Weaver tased and arrested a motorist during a traffic stop "upon perceiving a threat to his own safety."  The second example occurred in 2021, when Stratton led a male Sheriff's Office deputy on a car chase that ended in a crash.  In response, the Sheriff's Office dispatched approximately 10 law-enforcement officers, who deployed pepper spray, tasers, and rifles against Stratton and arrested him immediately at the scene.

Based on these allegations, the Estate filed suit against Defendants in January 2025.  *See Jaco v. Bloechle*, 739 F.2d 239, 245 (6th Cir. 1984) (holding that a decedent's personal representative "has standing to prosecute [] § 1983 claims arising from [the decedent's] death").  The Estate asserts two claims under 42 U.S.C. § 1983 for Defendants' alleged violation of the Equal Protection Clause and one claim for violation of Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, *et seq.*  In July 2025, the district court dismissed the Estate's complaint in its entirety, holding that the federal claims failed for lack of standing and for failure to state a claim, and declining to exercise supplemental jurisdiction over the state-law claims. This timely appeal followed.

## II. ANALYSIS

### A.  Standard of review

"We review dismissals for lack of subject-matter jurisdiction, including those for lack of standing, de novo."  *Phillips v. DeWine*, 841 F.3d 405, 413 (6th Cir. 2016).  "Likewise, we review de novo a grant of a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted."  *Id.*  "We must accept as true all of the well-pleaded allegations of the complaint, construing those allegations in the light most favorable to the plaintiff."  *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002).

**B.        The Estate lacks standing to bring its federal equal-protection claims**

The only claims at issue in this appeal are the Estate's federal equal-protection claims. Under the Equal Protection Clause of the Fourteenth Amendment, "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005) (quoting *Purisch v. Tenn. Tech. Univ.,* 76 F.3d 1414, 1424 (6th Cir. 1996)). A government actor engages in discrimination when it "selectively den[ies] its protective services to certain disfavored" groups, such as women. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989).

Before we determine whether the Estate has sufficiently pleaded its equal-protection claims, however, we must first address "[t]he issue of standing," which is "the threshold question in every federal case." *Miller v. City of Cincinnati*, 622 F.3d 524, 531 (6th Cir. 2010) (quoting *Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir.1987)). "Article III of the United States Constitution limits the jurisdiction of federal courts to actual 'Cases' and 'Controversies.'" *Dayton Area Chamber of Com. v. Kennedy*, 147 F.4th 626, 632 (6th Cir. 2025) (quoting U.S. Const. art. III, § 2, cl. 1). "To satisfy this 'case-or-controversy' requirement, a plaintiff must establish three elements: (1) an 'injury in fact' that is 'concrete and particularized,' and 'actual or imminent'; (2) 'a causal connection between the injury and the conduct' at issue, meaning that the injury must be fairly traceable to the defendant's action; and (3) a likelihood that the injury would be 'redressed by a favorable decision' of the court." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). A failure to establish any one of these elements is fatal to the plaintiff's standing to sue. *See id.*

"Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982). One of these prudential principles is that the "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v.*

*Seldin*, 422 U.S. 490, 499 (1975). This rule is not "absolute," since "there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004). But the Supreme Court has "limited this exception" to situations where "the party asserting the right has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Id.* at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). A failure to satisfy this prudential rule, moreover, dooms a plaintiff's claims, *id.* at 134, "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement." *Warth*, 422 U.S. at 499; *see also Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 n.2 (6th Cir. 2014) (explaining that the third-party standing rule may be raised *sua sponte*).

We conclude that the Estate's equal-protection claims run afoul of the prudential third-party standing rule. As an initial matter, these claims are not based on Henry's own legal rights. Because the Equal Protection Clause guarantees all "person[s] . . . the equal protection of the laws," *see* U.S. Const. amend. XIV, § 1, the legal rights underlying an equal-protection claim belong to the person who has been denied equal protection. Accordingly, a plaintiff must show that he or she personally experienced unequal treatment by the government in order to maintain an equal-protection claim based on his or her "own legal rights and interests." *See Warth*, 422 U.S. at 499; *see also Sessions v. Morales-Santana*, 582 U.S. 47, 56–57 (2017) (explaining that the plaintiff did not hold the "legal rights" underlying his equal-protection claim because he "d[id] not suffer discrimination on the basis of *his* gender" (emphasis in original)).

The Estate has failed to make this showing. It asserts that Defendants engaged in gender-based discrimination by "ignoring and/or minimizing reports from women and girls" and by "treat[ing] women and girls at risk of imminent harm differently than men at risk of harm." Indeed, the complaint alleges that Defendants had a longstanding "custom, policy, and practice of either failing to respond or responding with indifference or a lack of urgency to reports about Stratton or other men threatening women or girls." The problem, however, is that Henry never personally experienced any such discriminatory treatment.

The complaint does not allege that Henry ever made any report about Stratton to the Sheriff's Office.  In fact, during the 2019 incident when Stratton attempted to break into Henry's home, Henry deliberately chose not to alert the police.  And the only report that the Sheriff's Office ever received regarding a "risk of imminent harm" to Henry was the 911 call from her son McCord on the very day of the murder.  Nowhere in the complaint is there an allegation that Defendants ignored, minimized, or failed to respond to that report.  To the contrary, the complaint concedes that "numerous" officers arrived on the scene and immediately arrested and charged Stratton that same day.

The complaint instead alleges that Defendants trivialized and dismissed reports about Stratton made by *other* women (Lonoconus and TW), which caused Henry's death by allowing Stratton to remain free to attack her.  But under that theory, only Lonoconus and TW suffered violations of their equal-protection rights, because only those women could contend that they were personally denied equal treatment by Defendants.  This means that the Estate's claims are not based on Henry's own equal-protection rights, but rather on the alleged violation of those rights possessed by Lonoconus and TW.  *See Sessions*, 582 U.S. at 56.

As explained above, the Estate's equal-protection claims may nevertheless survive if they fall within the "limited" exception for third-party standing.  *See Kowalski*, 543 U.S. at 130.  "A plaintiff may raise a constitutional claim on behalf of a third party if he can prove (1) injury-in-fact to the plaintiff, (2) a close relationship between the plaintiff and the third party whose rights he asserts, and (3) a hindrance preventing the third party from raising his own claim."  *Moody v. Mich. Gaming Control Bd.*, 847 F.3d 399, 402 (6th Cir. 2017).  But the Estate fails to satisfy this test.  Even if it could allege a sufficient injury-in-fact to Henry, the Estate makes no attempt to satisfy the second or third elements.  Nor could it, because Henry lacked any "close relationship" to Lonoconus or TW, and there is no indication that these latter women are hindered from vindicating their own equal-protection rights.

The Estate's failure to demonstrate third-party standing thus forecloses its equal-protection claims.  *See Kowalski*, 543 U.S. at 134.  And because the Estate does not challenge the district court's refusal to exercise supplemental jurisdiction over the Estate's state-law claims, that issue is waived on appeal.  *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th

Cir. 2005) ("[F]ailure to raise an argument in [an] appellate brief constitutes a waiver of the argument on appeal."). The Estate's complaint was therefore properly dismissed in its entirety.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.