Justice Souter, with whom Justice Ginsburg joins,
dissenting.
Indiana’s “Voter ID Law”[1] threatens to impose nontrivial burdens on the voting right of tens of thousands of the State’s citizens, see ante, at 198-199 (lead opinion), and a significant percentage of those individuals are likely to be deterred from voting, see ante, at 199. The statute is unconstitutional under the balancing standard of Burdick v. Ta~ kushi, 504 U. S. 428 (1992): a State may not burden the right to vote merely by invoking abstract interests, be they legitimate, see ante, at 191-197, or even compelling, but must make a particular, factual showing that threats to its interests outweigh the particular impediments it has imposed. The State has made no such justification here, and as to some aspects of its law, it has hardly even tried. I therefore respectfully dissent from the Court’s judgment sustaining the statute.[2]
*210 I
Voting-rights cases raise two competing interests, the one side being the fundamental right to vote. See Burdick, supra, at 433 (“It is beyond cavil that ‘voting is of the most fundamental significance under our constitutional structure’ ” (quoting Illinois Bd. of Elections v. Socialist Workers Party, 440 U. S. 173, 184 (1979))); see also Purcell v. Gonzalez, 549 U. S. 1, 3-4 (2006) (per curiam); Dunn v. Blumstein, 405 U. S. 330, 336 (1972); Reynolds v. Sims, 377 U. S. 533, 561-562 (1964); Yick Wo v. Hopkins, 118 U. S. 356,370 (1886). The Judiciary is obliged to train a skeptical eye on any qualification of that right. See Reynolds, supra, at 562 (“Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized”).
As against the unfettered right, however, lies the “Common sense, as well as constitutional law ... that government must play an active role in structuring elections; ‘as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.’” Burdick, supra, at 433 (quoting Storer v. Brown, 415 U. S. 724, 730 (1974)); see also Burdick, 504 U. S., at 433 (“Election laws will invariably impose some burden upon individual voters”).
Given the legitimacy of interests on both sides, we have avoided preset levels of scrutiny in favor of a sliding-scale balancing analysis: the scrutiny varies with the effect of the regulation at issue. And whatever the claim, the Court has long made a careful, ground-level appraisal both of the practical burdens on the right to vote and of the State’s reasons for imposing those precise burdens. Thus, in Burdick:
“A court considering [such] a challenge . . . must weigh ‘the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth *211 Amendments that the jplaintiff seeks to vindicate’ against ‘the precise interests put forward by the State as justifications for the burden imposed by its rule,’ taking into consideration ‘the extent to which those interests make it necessary to burden the plaintiff’s rights.’” Id., at 434 (quoting Anderson v. Celebrezze, 460 U. S. 780, 789 (1983)).
The lead opinion does not disavow these basic principles. See ante, at 190-191 (discussing Burdick); see also ante, at 191 (“However slight [the] burden may appear, ... it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation” (internal quotation marks omitted)). But I think it does not insist enough on the hard facts that our standard of review demands.
II
Under Burdick, “the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights,” 504 U. S., at 434, upon an assessment of the “ ‘character and magnitude of the asserted [threatened] injury,’ ” ibid, (quoting Anderson, supra, at 789), and an estimate of the number of voters likely to be affected.
A
The first set of burdens shown in these cases is the travel costs and fees necessary to get one of the limited variety of federal or state photo identifications needed to cast a regular ballot under the Voter ID Law.[3] The travel is required for *212 the personal visit to a license branch of the Indiana Bureau of Motor Vehicles (BMV), which is demanded of anyone applying for a driver’s license or nondriver photo identification. See 458 F. Supp. 2d 775, 791 (SD Ind. 2006). The need to travel to a BMV branch will affect voters according to their circumstances, with the average person probably viewing it as nothing more than an inconvenience. Poor, old, and disabled voters who do not drive a car, however, may find the trip prohibitive,[4] witness the fact that the BMV *213 has far fewer license branches in each county than there are voting precincts.[5] Marion County, for example, has over 900 active voting precincts, see Brief for Respondent Marion County Election Board 4,[6] yet only 12 BMV license branches;[7] in Lake County, there are 565 active voting precincts, see n. 6, supra, to match up with only 8 BMV locations;[8] and Allen County, with 309 active voting precincts, see ibid., has only 3 BMV license branches.[9] The same pattern holds in counties with smaller populations. Brown County has 12 active voter precincts, see ibid., and only 1 BMV office;[10] while there were 18 polling places available in Fayette County’s 2007 municipal primary,[11] there was only 1 BMV license branch;[12] and Henry County, with 42 polling places approved for 2008 elections,[13] has only 1 BMV office.
The burden of traveling to a more distant BMV office rather than a conveniently located polling place is probably *214 serious for many of the individuals who lack photo identification.[14] They almost certainly will not own cars, see Brief for Current and Former State Secretaries of State as Amici Curiae 11, and public transportation in Indiana is fairly limited. According to a report published by Indiana’s Department of Transportation in August 2007, 21 of Indiana’s 92 counties have no public transportation system at all,[15] and as of 2000, nearly 1 in every 10 voters lived within 1 of these 21 counties.[16] Among the counties with some public system, 21 provide service only within certain cities, and 32 others restrict public transportation to regional county service, *215 leaving only 18 that offer eountywide public transportation, see n. 15, swpra. State officials recognize the effect that travel costs can have on voter turnout, as in Marion County, for example, where efforts have been made to “establish] most polling places in locations even more convenient than the statutory minimum,” in order to “provid[e] for neighborhood voting.” Brief for Respondent Marion County Election Board 3-4.
Although making voters travel farther than what is convenient for most and possible for some does not amount to a “severe” burden under Burdick, that is no reason to ignore the burden altogether. It translates into an obvious economic cost (whether in worktime lost, or getting and paying for transportation) that an Indiana voter must bear to obtain an ID.
For those voters who can afford the round trip, a second financial hurdle appears: in order to get photo identification for the first time, they need to present “a birth certificate, certificate of naturalization, U. S. veterans photo identification, U. S. military photo identification, or a U. S. passport.” Ante, at 198, n. 17 (lead opinion) (citing Ind. Admin. Code, tit. 140, §7-4-3 (2008)). As the lead opinion says, the two most common of these documents come at a price: Indiana counties charge anywhere from $3 to $12 for a birth certificate (and in some other States the fee is significantly higher), see ante, at 198, n. 17, and that same price must usually be paid for a first-time passport, since a birth certificate is required to prove U. S. citizenship by birth. The total fees for a passport, moreover, are up to about $100.[17] So most voters must pay at least one fee to get the ID necessary to cast *216 a regular ballot.[18] As with the travel costs, these fees are far from shocking on their face, but in the Burdick analysis it matters that both the travel costs and the fees are disproportionately heavy for, and thus disproportionately likely to deter, the poor, the old, and the immobile.
B
To be sure, Indiana has a provisional-ballot exception to the ID requirement for individuals the State considers “indigent”[19] as well as those with religious objections to being photographed, see ante, at 199-200 (lead opinion), and this sort of exception could in theory provide a way around the costs of procuring an ID. But Indiana’s chosen exception does not amount to much relief.
The law allows these voters who lack the necessary ID to sign the pollbook and cast a provisional ballot. See 458 F. Supp. 2d, at 786 (citing Ind. Code Ann. §3-11-8-25.1 (West Supp. 2007)). As the lead opinion recognizes, though, ante, at 199-200, that is only the first step; to have the provisional ballot counted, a voter must then appear in person before the circuit court clerk or county election board within 10 days of the election, to sign an affidavit attesting to indigency or religious objection to being photographed (or to present an *217 ID at that point),[20] see 458 F. Supp. 2d, at 786. Unlike the trip to the BMV (which, assuming things go smoothly, needs to be made only once every four years for renewal of non-driver photo identification, see id., at 791), this one must be taken every time a poor person or religious objector wishes to vote, because the State does not allow an affidavit to count in successive elections. And unlike the trip to the BMV (which at least has a handful of license branches in the more populous counties), a county has only one county seat. Forcing these people to travel to the county seat every time they try to vote is particularly onerous for the reason noted already, that most counties in Indiana either lack public transportation or offer only limited coverage. See supra, at 213-215.
That the need to travel to the county seat each election amounts to a high hurdle is shown in the results of the 2007 municipal elections in Marion County, to which Indiana’s Voter ID Law applied. Thirty-four provisional ballots were cast, but only two provisional voters made it to the county clerk’s office within the 10 days. See Brief for Respondent Marion County Election Board 8-9. All 34 of these aspiring voters appeared at the appropriate precinct; 33 of them provided a signature, and every signature matched the one on file; and 26 of the 32 voters whose ballots were not counted had a history of voting in Marion County elections. See id., at 9.
All of this suggests that provisional ballots do not obviate the burdens of getting photo identification. And even if that were not so, the provisional-ballot option would be inade *218 quate for a further reason: the indigency exception by definition offers no relief to those voters who do not consider themselves (or would not be considered) indigent but as a practical matter would find it hard, for nonfinancial reasons, to get the required ID (most obviously the disabled).
C
Indiana’s Voter ID Law thus threatens to impose serious burdens on the voting right, even if not “severe” ones, and the next question under Burdick is whether the number of individuals likely to be affected is significant as well. Record evidence and facts open to judicial notice answer yes.
Although the District Court found that petitioners failed to offer any reliable empirical study of numbers of voters affected, see ante, at 200 (lead opinion),[21] we may accept that court’s rough calculation that 43,000 voting-age residents lack the kind of identification card required by Indiana’s law. See 458 F. Supp. 2d, at 807. The District Court made that estimate by comparing BMV records reproduced in petitioners’ statistician’s report with U. S. Census Bureau figures for Indiana’s voting-age population in 2004, see ibid., and the State does not argue that these raw data are unreliable.
The State, in fact, shows no discomfort with the District Court’s finding that an “estimated 43,000 individuals” (about 1% of the State’s voting-age population) lack a qualifying ID. Brief for State Respondents 25. If the State’s willingness to take that number is surprising, it may be less so in light of the District Court’s observation that “several factors . . . suggest the percentage of Indiana’s voting age population with photo identification is actually lower than 99%, ” 458 *219 F. Supp. 2d, at 807, n. 43,[22] a suggestion in line with national surveys showing roughly 6%-10% of voting-age Americans without a state-issued photo identification card. See Brief for Petitioners in No. 07-21, pp. 39-40, n. 17 (citing National Commission on Election Reform, To Assure Pride and Confidence: Task Force Reports, ch. VI: Verification of Identity, p. 4 (Aug. 2001), http://webstorage3.mcpa.virginia.edu/ commissions/comm_2001_taskforce.pdf). We have been offered no reason to think that Indiana does a substantially better job of distributing IDs than other States.[23]
*220 So a fair reading of the data supports the District Court’s finding that around 43,000 Indiana residents lack the needed identification, and will bear the burdens the law imposes. To be sure, the 43,000 figure has to be discounted to some extent, residents of certain nursing homes being exempted from the photo identification requirement. 458 F. Supp. 2d, at 786. But the State does not suggest that this narrow exception could possibly reduce 43,000 to an insubstantial number.[24]
The upshot is this. Tens of thousands of voting-age residents lack the necessary photo identification. A large proportion of them are likely to be in bad shape economically, *221 see 472 F. 3d 949, 951 (CA7 2007) (“No doubt most people who don’t have photo ID are low on the economic ladder”); cf. Bullock v. Carter, 405 U. S. 134, 144 (1972) (“[W]e would ignore reality were we not to recognize that this system falls with unequal weight on voters . . . according to their economic status”).[25] The Voter ID Law places hurdles in the way of either getting an ID or of voting provisionally, and they translate into nontrivial economic costs. There is accordingly no reason to doubt that a significant number of state residents will be discouraged or disabled from voting. Cf. 458 F. Supp. 2d, at 823 (“We do not doubt that such individuals exist somewhere, even though Plaintiffs were unable to locate them”); 472 F. 3d, at 952 (“No doubt there are at least a few [whom the law will deter from voting] in Indiana . . . ”); see also ante, at 199-200 (lead opinion).
Petitioners, to be sure, failed to nail down precisely how great the cohort of discouraged and totally deterred voters will be, but empirical precision beyond the foregoing numbers has never been demanded for raising a voting-rights claim. Cf. Washington State Grange v. Washington State Republican Party, 552 U. S. 442, 461-462 (2008) (Roberts, C. J., concurring) (“Nothing in my analysis requires the parties to produce studies regarding voter perceptions on this score”); Dunn, 405 U. S., at 335, n. 5 (“[I]t would be difficult to determine precisely how many would-be voters throughout the country cannot vote because of durational residence *222 requirements”); Bullock, supra, at 144 (taking account of “the obvious likelihood” that candidate filing fees would “fall more heavily on the less affluent segment of the community, whose favorites may be unable to pay the large costs”). While of course it would greatly aid a plaintiff to establish his claims beyond mathematical doubt, he does enough to show that serious burdens are likely.
Thus, petitioners’ case is clearly strong enough to prompt more than a cursory examination of the State’s asserted interests. And the fact that Indiana’s photo identification requirement is one of the most restrictive in the country, see Brief for Current and Former State Secretaries of State as Amici Curiae 27-30 (compiling state voter-identification statutes); see also Brief for State of Texas et al. as Amici Curiae 10-13 (same),[26] makes a critical examination of the *223 State’s claims all the more in order. Cf. Randall v. Sorrell, 548 U. S. 230, 253 (2006) (plurality opinion) (citing as a “danger sig[n]” that “contribution limits are substantially lower than . . . comparable limits in other States,” and concluding that “[w]e consequently must examine the record independently and carefully to determine whether [the] limits are ‘closely drawn’ to match the State’s interests”); id., at 284, 288 (Souter, J., dissenting) (finding that deference was appropriate on the reasoning that limits were “consistent with limits set by the legislatures of many other States, all of them with populations larger than Vermont’s,” and that “[t]he Legislature of Vermont evidently tried to account for the realities of campaigning in Vermont”).
Ill
Because the lead opinion finds only “limited” burdens on the right to vote, see ante, at 202-203, it avoids a hard look at the State’s claimed interests. See ante, at 191-197. But having found the Voter ID Law burdens far from trivial, I have to make a rigorous assessment of “ ‘the precise interests put forward by the State as justifications for the burden imposed by its rule,’ [and] ‘the extent to which those inter *224 ests make it necessary to burden the plaintiff’s rights.’” Burdick, 504 U. S., at 434 (quoting Anderson, 460 U. S., at 789).
As this quotation from Burdick indicates, the interests claimed to justify the regulatory scheme are subject to discount in two distinct ways. First, the generalities raised by the State have to be shaved down to the precise “aspect[s of claimed interests] addressed by the law at issue.” California Democratic Party v. Jones, 530 U. S. 567, 584 (2000) (emphasis deleted); see ibid, (scrutiny of state interests “is not to be made in the abstract, by asking whether [the interests] are highly significant values; but rather by asking whether the aspect of [those interests] addressed by the law at issue is highly significant” (emphasis in original)). And even if the State can show particularized interests addressed by the law, those interests are subject to further discount.depending on “the extent to which [they] make it necessary to burden the plaintiff’s rights.” Burdick, supra, at 434 (internal quotation marks omitted).
As the lead opinion sees it, the State has offered four related concerns that suffice to justify the Voter ID Law: modernizing election procedures, combating voter fraud, addressing the consequences of the State’s bloated voter rolls, and protecting public confidence in the integrity of the electoral process. See ante, at 191-197. On closer look, however, it appears that the first two (which are really just one) can claim modest weight at best, and the latter two if anything weaken the State’s case.
A
The lead opinion’s discussion of the State’s reasons begins with the State’s asserted interests in “election modernization,” ante, at 192-197, and in combating voter fraud, see ante, at 194-197. Although these are given separate headings, any line drawn between them is unconvincing; as I un *225 derstand it, the “effort to modernize elections,” Brief for State Respondents 12, is not for modernity’s sake, but to reach certain practical (or political) objectives.[27] In any event, if a proposed modernization were in fact aimless, if it were put forward as change for change’s sake, a State could not justify any appreciable burden on the right to vote that might ensue; useless technology has no constitutional value. And in fact that is not the case here. The State says that it adopted the ID law principally to combat voter fraud, and it is this claim, not the slogan of “election modernization,” that warrants attention.
1
There is no denying the abstract importance, the compelling nature, of combating voter fraud. See Purcell, 549 U. S., at 4 (acknowledging “the State’s compelling interest in preventing voter fraud”); cf. Eu v. San Francisco County Democratic Central Comm., 489 U. S. 214, 231 (1989) (“A State indisputably has a compelling interest in preserving the integrity of its election process”). But it takes several steps to get beyond the level of abstraction here.
To begin with, requiring a voter to show photo identification before casting a regular ballot addresses only one form of voter fraud: in-person voter impersonation. The photo identification requirement leaves untouched the problems of absentee-ballot fraud, which (unlike in-person voter impersonation) is a documented problem in Indiana, see 458 F. Supp. 2d, at 793; of registered voters voting more than once (but maintaining their own identities) in different counties or in different States; of felons and other disqualified individuals voting in their own names; of vote buying; or, for that matter, of ballot stuffing, ballot miscounting, voter *226 intimidation, or any other type of corruption on the part of officials administering elections. See Brief for Brennan Center for Justice et al. as Amici Curiae 7.
And even the State’s interest in deterring a voter from showing up at the polls and claiming to be someone he is not must, in turn, be discounted for the fact that the State has not come across a single instance of in-person voter impersonation fraud in all of Indiana’s history. See 458 F. Supp. 2d, at 792-793; see also ante, at 194-197 (lead opinion). Neither the District Court nor the Indiana General Assembly that passed the Voter ID Law was given any evidence whatsoever of in-person voter impersonation fraud in the State. See 458 F. Supp. 2d, at 793. This absence of support is consistent with the experience of several veteran poll watchers in Indiana, each of whom submitted testimony in the District Court that he had never witnessed an instance of attempted voter impersonation fraud at the polls. Ibid. It is also consistent with the dearth of evidence of in-person voter impersonation in any other part of the country. See ante, at 195, n. 12 (lead opinion) (conceding that there are at most “scattered instances of in-person voter fraud”); see also Brief for Brennan Center for Justice, supra, at 11-25 (demonstrating that “the national evidence — including the very evidence relied on by the courts below — suggests that the type of voting fraud that may be remedied by a photo identification requirement is virtually nonexistent: the ‘problem’ of voter impersonation is not a real problem at all”).[28]
The State responds to the want of evidence with the assertion that in-person voter impersonation fraud is hard to de *227 tect. But this is like saying the “man who wasn’t there” is hard to spot,[29] and to know whether difficulty in detection accounts for the lack of evidence one at least has to ask whether in-person voter impersonation is (or would be) relatively harder to ferret out than other kinds of fraud (e. g., by absentee ballot) which the State has had no trouble documenting. The answer seems to be no; there is reason to think that “impersonation of voters is . . . the most likely type of fraud to be discovered.” U. S. Election Assistance Commission, Election Crimes: An Initial Review and Recommendations for Future Study 9 (Dec. 2006) (hereinafter EAC Report), http://www.eac.gov/clearinghouse/docs/ reports-and-surveys-2006electioncrimes.pdf/attachment_ download/file. This is in part because an individual who impersonates another at the polls commits his fraud in the open, under the scrutiny of local pollworkers who may well recognize a fraudulent voter when they hear who he claims to be. See Brief for Respondent Marion County Election Board 6 (“[P]reeinet workers may recognize an imposter, and precinct election workers have the authority to challenge persons appearing to vote if the election board member ‘is not satisfied that a person who offers to vote is the person who the person represents the person to be’ ” (quoting Ind. Code Ann. §3-11-8-27 (West 2006))).
The relative ease of discovering in-person voter impersonation is also owing to the odds that any such fraud will be committed by “organized groups such as campaigns or political parties” rather than by individuals acting alone. L. Minnite & D. Callahan, Securing the Vote: An Analysis of Election Fraud 14 (2003), http://www.demos.org/pubs/ EDR_-_Securing_the_Vote.pdf. It simply is not worth it for individuals acting alone to commit in-person voter impersonation, which is relatively ineffectual for the foolish few *228 who may commit it. If an imposter gets caught, he is subject to severe criminal penalties. See, e. g., Ind. Code Ann. §3-14-2-9 (West 2006) (making it a felony “knowingly [to] vot[e] or offe[r] to vote at an election when the person is not registered or authorized to vote”); § 3-14-2-11 (with certain exceptions, “a person who knowingly votes or offers to vote in a precinct except the one in which the person is registered and resides” commits a felony); § 3-14-2-12(1) (making it a felony “knowingly [to] vot[e] or mak[e] application to vote in an election in a name other than the person’s own”); § 3-14-2-12(2) (a person who, “having voted once at an election, knowingly applies to vote at the same election in the person’s own name or any other name” commits a felony); see also 42 U. S. C. § 1973i(e)(l) (any individual who “votes more than once” in certain federal elections “shall be fined not more than $10,000 or imprisoned not more than five years, or both”). And even if he succeeds, the imposter gains nothing more than one additional vote for his candidate. See EAC Report 9 (in-person voter impersonation “is an inefficient method of influencing an election”); J. Levitt, The Truth About Voter Fraud 7 (2007), online at http://truthaboutfraud. org/pdf/TruthAboutVoterFraud.pdf (“[F]raud by individual voters is a singularly foolish and ineffective way to attempt to win an election. Each act of voter fraud in connection with a federal election risks five years in prison and a $10,000 fine, in addition to any state penalties. In return, it yields at most one incremental vote. That single extra vote is simply not worth the price” (footnote omitted)); cf. 472 F. 3d, at 951 (“[A] vote in a political election rarely has any instrumental value, since elections for political office at the state or federal level are never decided by just one vote” (emphasis in original)).
In sum, fraud by individuals acting alone, however difficult to detect, is unlikely. And while there may be greater incentives for organized groups to engage in broad-gauged in- *229 person voter impersonation fraud, see Minnite & Callahan, supra, at 20, it is also far more difficult to conceal larger enterprises of this sort. The State’s argument about the difficulty of detecting the fraud lacks real force.
2
Nothing else the State has to say does much to bolster its case. The State argues, for example, that even without evidence of in-person voter impersonation in Indiana, it is enough for the State to show that “opportunities [for such fraud] are transparently obvious in elections without identification checks,” Brief for State Respondents 54. Of course they are, but Indiana elections before the Voter ID Law were not run “without identification checks”; on the contrary, as the Marion County Election Board informs us, “[t]imetested systems were in place to detect in-person voter impersonation fraud before the challenged statute was enacted,” Brief for Respondent Marion County Election Board 6. These included hiring pollworkers who were precinct residents familiar with the neighborhood and making signature comparisons, each effort being supported by the criminal provisions mentioned before. Id., at 6-8.
For that matter, the deterrence argument can do only so much work, since photo identification is itself hardly a fail-safe against impersonation. Indiana knows this, and that is why in 2007 the State began to issue redesigned driver’s licenses with digital watermarking.[30] The State has made this shift precisely because, in the words of its BMV, “visual inspection is not adequate to determine the authenticity” of driver’s licenses. See Indiana BMV, supra n. 30. Indeed, the BMV explains that the digital watermark (which can be scanned using equipment that, so far, Indiana does not use *230 at polling places) is needed to “tak[e] the guesswork out of inspection.” Ibid.[31] So, at least until polling places have the machines and special software to scan the new driver’s licenses, and until all the licenses with the older designs expire (the licenses issued after 2006 but before the 2007 redesigning are good until 2012, see 458 F. Supp. 2d, at 791), Indiana’s law does no more than ensure that any in-person voter fraud will take place with fake IDs, not attempted signature forgery.
Despite all this, I will readily stipulate that a State has an interest in responding to the risk (however small) of in-person voter impersonation. See ante, at 196 (lead opinion). I reach this conclusion, like others accepted by the Court, because “ ‘[wjhere a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments.’ ” Randall, 548 U. S., at 285 (Souter, J., dissenting) (quoting Nixon v. Shrink Missouri Government PAC, 528 U. S. 377, 402 (2000) (Breyer, J., concurring)). Weight is owed to the legislative judgment as such. But the ultimate valuation of the particular interest a State asserts has to take account of evidence against it as well as legislative judgments for it (certainly when the law is one of the most restrictive of its kind, see n. 26, supra), and on this record it would be unreasonable to accord this assumed state interest more than very modest significance.[32]
*231 3
The antifraud rationale is open to skepticism on one further ground, what Burdick spoke of as an assessment of the degree of necessity for the State’s particular course of action. Two points deserve attention, the first being that the State has not even tried to justify its decision to implement the photo identification requirement immediately on passage of the new law. A phase-in period would have given the State time to distribute its newly designed licenses, and to make a genuine effort to get them to individuals in need, and a period for transition is exactly what the Commission on Federal Election Reform, headed by former President Carter and former Secretary of State Baker, recommended in its report. See Building Confidence in U. S. Elections §2.5 (Sept. 2005), App. 136, 140 (hereinafter Carter-Baker Report) (“For the next two federal elections, until January 1, 2010, in states that require voters to present identification at the polls, voters who fail to do so should nonetheless be allowed to cast a provisional ballot, and their ballot would count if their signature is verified”). During this phase-in period, the report said, States would need to make “efforts to ensure that all voters are provided convenient opportunities to obtain” the required identification. Id., at 141. The former President and former Secretary of State explained this recommendation in an op-ed essay:
“Yes, we are concerned about the approximately 12 percent of citizens who lack a driver’s license. So we proposed that states finally assume the responsibility to seek out citizens to both register voters and pro *232 vide them with free ID’s that meet federal standards. States should open new offices, use social service agencies and deploy mobile offices to register voters. By connecting ID’s to registration, voting participation will be expanded.” Carter & Baker, Voting Reform Is in the Cards, N. Y. Times, Sept. 23, 2005, p. A19.
Although Indiana claims to have adopted its ID requirement relying partly on the Carter-Baker Report, see Brief for State Respondents 5,13, 49; see also ante, at 194 (lead opinion), the State conspicuously rejected the Carter-Baker Report’s phase-in recommendation aimed at reducing the burdens on the right to vote, and just as conspicuously fails even to try to explain why.
What is left of the State’s claim must be downgraded further for one final reason: regardless of the interest the State may have in adopting a photo identification requirement as a general matter, that interest in no way necessitates the particular burdens the Voter ID Law imposes on poor people and religious objectors. Individuals unable to get photo identification are forced to travel to the county seat every time they wish to exercise the franchise, and they have to get there within 10 days of the election. See supra, at 216-218. Nothing about the State’s interest in fighting voter fraud justifies this requirement of a postelection trip to the county seat instead of some verification process at the polling places.
In briefing this Court, the State responds by pointing to an interest in keeping lines at polling places short. See Brief for State Respondents 58. It warns that “[i]f election workers — a scarce resource in any election — must attend to the details of validating provisional ballots, voters may have to wait longer to vote,” and it assures us that “[njothing deters voting so much as long lines at the polls.” Ibid. But this argument fails on its own terms, for whatever might be the number of individuals casting a provisional ballot, the *233 State could simply allow voters to sign the indigency affidavit at the polls subject to review there after the election.[33] After all, the Voter ID Law already requires voters lacking photo identification to sign, at the polling site, an affidavit attesting to proper registration. See 458 F. Supp. 2d, at 786.
Indeed, the State’s argument more than fails; it backfires, in implicitly conceding that a not-insignificant number of individuals will need to rely on the burdensome provisional-ballot mechanism. What is more, as the District Court found, the Voter ID Law itself actually increases the likelihood of delay at the polls. Since any minor discrepancy between a voter’s photo identification card and the registration information may lead to a challenge, “the opportunities for presenting challenges ha[ve] increased as a result of the photo identification requirements.” Id., at 789; cf. 472 F. 3d, at 955 (Evans, J., dissenting) (“The potential for mischief with this law is obvious. Does the name on the ID ‘conform’ to the name on the voter registration list? If the last name of a newly married woman is on the ID but her maiden name is on the registration list, does it conform? If a name is misspelled on one — Schmit versus Schmitt — does it conform? If a ‘Terence’ appears on one and a shortened ‘Terry’ on the other, does it conform?”).
B
The State’s asserted interests in modernizing elections and combating fraud are decidedly modest; at best, they fail to offset the clear inference that thousands of Indiana citizens will be discouraged from voting. The two remaining justifications, meanwhile, actually weaken the State’s case.
*234 The lead opinion agrees with the State that “the inflation of its voter rolls provides further support for its enactment of” the Voter ID Law. Ante, at 196. This is a puzzling conclusion, given the fact, which the lead opinion notes, that the National Government filed a complaint against Indiana, containing this allegation:
“Indiana has failed to conduct a general program that makes a reasonable effort to identify and remove ineligible voters from the State’s registration list; has failed to remove such ineligible voters; and has failed to engage in oversight actions sufficient to ensure that local election jurisdictions identify and remove such ineligible voters.” App. 309, 312.
The Federal Government and the State agreed to settle the case, and a consent decree and order have been entered, see ante, at 196, requiring Indiana to fulfill its list-maintenance obligations under § 8 of the National Voter Registration Act of 1993, 107 Stat. 82, 42 U. S. C. § 1973gg-6.
How any of this can justify restrictions on the right to vote is difficult to say. The State is simply trying to take advantage of its own wrong: if it is true that the State’s fear of in-person voter impersonation fraud arises from its bloated voter checklist, the answer to the problem is in the State’s own hands. The claim that the State has an interest in addressing a symptom of the problem (alleged impersonation) rather than the problem itself (the negligently maintained bloated rolls) is thus self-defeating; it shows that the State has no justifiable need to burden the right to vote as it does, and it suggests that the State is not as serious about combating fraud as it claims to be.[34]
*235 The State’s final justification, its interest in safeguarding voter confidence, similarly collapses. The problem with claiming this interest lies in its connection to the bloated voter rolls; the State has come up with nothing to suggest that its citizens doubt the integrity of the State’s electoral process, except its own failure to maintain its rolls. The answer to this problem is not to burden the right to vote, but to end the official negligence.
It should go without saying that none of this is to deny States’ legitimate interest in safeguarding public confidence. The Court has, for example, recognized that fighting perceptions of political corruption stemming from large political contributions is a legitimate and substantial state interest, underlying not only campaign finance laws, but bribery and antigratuity statutes as well. See Nixon, 528 U. S., at 390. But the force of the interest depends on the facts (or plausibility of the assumptions) said to justify invoking it. See id., at 391 (“The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised”). While we found in Nixon that “there is little reason to doubt that sometimes large contributions will work actual corruption of our political system, and no reason to question the existence of a corresponding suspicion among voters,” id., at 395, there is plenty of reason to be doubtful here, both about the reality and the perception. It is simply not plausible to assume here, with no evidence of in-person voter impersonation fraud in a State, and very little of it nationwide, that a public perception of such fraud is nevertheless “inherent” in an election system providing severe criminal penalties for fraud and mandating signature checks at the polls. Cf. id., at 390 (“[T]he perception of corruption [is] ‘inherent in a regime of large individual financial contributions’ to candidates for public office” (quoting Buckley v. Valeo, 424 U. S. 1, 27 (1976) (per curiam))).
*236 c
Without a shred of evidence that in-person voter impersonation is a problem in the State, much less a crisis, Indiana has adopted one of the most restrictive photo identification requirements in the country. The State recognizes that tens of thousands of qualified voters lack the necessary federally issued or state-issued identification, but it insists on implementing the requirement immediately, without allowing a transition period for targeted efforts to distribute the required identification to individuals who need it. The State hardly even tries to explain its decision to force indigents or religious objectors to travel all the way to their county seats every time they wish to vote, and if there is any waning of confidence in the administration of elections it probably owes more to the State’s violation of federal election law than to any imposters at the polling places. It is impossible to say, on this record, that the State’s interest in adopting its signally inhibiting photo identification requirement has been shown to outweigh the serious burdens it imposes on the right to vote.
If more were needed to condemn this law, our own precedent would provide it, for the calculation revealed in the Indiana statute crosses a line when it targets the poor and the weak. Cf. Anderson, 460 U. S., at 793 (“[I]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status”). If the Court’s decision in Harper v. Virginia Bd. of Elections, 383 U. S. 663 (1966), stands for anything, it is that being poor has nothing to do with being qualified to vote. Harper made clear that “[t]o introduce wealth or payment of a fee as a measure of a voter’s qualifications is to introduce a capricious or irrelevant factor.” Id., at 668. The State’s requirements here, that people without cars travel to a motor vehicle registry and that the poor who fail to do that get to their county seats within 10 days of *237 every election, likewise translate into unjustified economic burdens uncomfortably close to the outright $1.50 fee we struck down 42 years ago. Like that fee, the onus of the Indiana law is illegitimate just because it correlates with no state interest so well as it does with the object of deterring poorer residents from exercising the franchise.
The Indiana Voter ID Law is thus unconstitutional: the state interests fail to justify the practical limitations placed on the right to vote, and the law imposes an unreasonable and irrelevant burden on voters who are poor and old. I would vacate the judgment of the Seventh Circuit, and remand for further proceedings.

 Senate Enrolled Act No. 483, 2005 Ind. Acts p. 2005.

I agree with the lead opinion that the petitioners in No. 07-25 have standing and that we therefore need not determine whether the remaining petitioners also have standing. See ante, at 189, n. 7.

 Under Indiana’s law, an ID does not qualify as proof of identification unless it “satisfies all [of] the following”:
“(1) The document shows the name of the individual to whom the document was issued, and the name conforms to the name in the individual’s voter registration record.
“(2) The document shows a photograph of the individual to whom the document was issued.
*212 “(3) The document includes an expiration date, and the document:
“(A) is not expired; or
“(B) expired after the date of the most recent general election.
“(4) The document was issued by the United States or the state of Indiana.” Ind. Code Ann. §3-5-2-40.5 (West 2006).

 The State asserts that the elderly and disabled are adequately accommodated through their option to cast absentee ballots, and so any burdens on them are irrelevant. See Brief for State Respondents 41. But as petitioners’ amici AARP and the National Senior Citizens Law Center point out, there are crucial differences between the absentee and regular ballot. Brief for AARP et al. as Amici Curiae 12-16. Voting by absentee ballot leaves an individual without the possibility of receiving assistance from pollworkers, and thus increases the likelihood of confusion and error. More seriously, as the Supreme Court of Indiana has recognized, Indiana law “treats absentee voters differently from the way it treats Election Day voters,” in the important sense that “an absentee ballot may not be recounted in situations where clerical error by an election officer rendered it invalid.” Horseman v. Keller, 841 N. E. 2d 164,171 (2006). The State itself notes that “election officials routinely reject absentee ballots on suspicion of forgery.” Brief for State Respondents 62. The record indicates that voters in Indiana are not unaware of these risks. One elderly affiant in the District Court testified: “I don’t trust [the absentee] system. . . . Because a lot of soldiers vote like that and their votes wasn’t counted in the last election according to what I read, absentee.” App. 209 (deposition of David Harrison).
It is one thing (and a commendable thing) for the State to make absentee voting available to the elderly and disabled; but it is quite another to suggest that, because the more convenient but less reliable absentee ballot is available, the State may freely deprive the elderly and disabled of the option of voting in person.

 Under Indiana law, county executives must locate a polling place within five miles of the closest boundary of each voting precinct, and, with limited exceptions, no precinct may cover more than 1,200 active voters at the time it is established. See Brief for Respondent Marion County Election Board 3 (citing Ind. Code Ann. §§ 3-ll-8-3(b), 3-11-1.5-3). The result is that the number of polling places tends to track the number of voting precincts in a county. In Henry County, for example, there are 42 active precincts, see n. 6, infra, and 42 polling places have been approved for the 2008 elections, see n. 13, infra.

 See also Count of Active Precincts by County, online at http://www.in. gov/sos/pdfs/Precincts_by_County_and_State_022706.pdf (all Internet materials as visited Apr. 21, 2008, and available in Clerk of Court’s case file).

 See Marion County License Branches, http://www.in.gov/bmv/3134.htm.

 See Lake County, http://www.in.gov/bmv/3150.htm.

 See Allen County, http://www.in.gov/bmv/2954.htm.

 See Brown County, http://www.in.gov/bmv/3302.htm.

 See http://www.co.fayette.in.us/2007%20polling_locations_munic.htm.

 See Fayette County, http://www.in.gov/bmv/3246.htm.

 See News Release, Henry County, Indiana, Polling Places Approved for the 2008 Elections, http://Avww.henryco.net/cm/node/52.

 The travel burdens might, in the future, be reduced to some extent by Indiana’s commendable “BMV2You” mobile license branch, which will travel across the State for an average of three days a week, and provide BMV services (including ID services). See http://www.in.gov/bmv/ 3554.htm. The program does not count in my analysis, however, because the program was only recently opened in August 2007, see Indiana BMV Opens License Branch at State Fair, http://www.in.gov/newsroom.htm? detailContent=93_10400.htm, and its long-term service schedule has yet to be determined.

 Indiana Public Transit: Annual Report 2006, p. 29 (hereinafter Annual Report), http://www.in.gov/indot/files/INDOT_2006.pdf. The 21 counties with no public transportation, according to the study, are: Adams, Black-ford, Brown, Carroll, Clay, De Kalb, Gibson, Jennings, Lagrange, Parke, Perry, Posey, Putnam, Rush, Spencer, Steuben, Tipton, Vermillion, Warren, Warrick, and Whitley. See ibid.
A Website of the American Public Transportation Association, which compiles public transit information across the States, confirms that each of those 21 counties lacks any public transportation offerings, and in fact adds another 13 counties to this category: Boone, Decatur, Fayette, Fulton, Hancock, Hendricks, Huntington, Miami, Morgan, Noble, Pike, Shelby, and Wells. See Transit Systems in Indiana, http://www.publictransportation. org/systems/state.asp?state=IN#A44. The discrepancy appears to arise, in part, from the fact that the American Public Transportation Association has not counted demand response systems that have been established in at least 6 of these 13 counties. See Annual Report 36,50, 56, 96,110,144.

 In 2000, approximately 9% of Indiana’s population lived within 1 of these 21 counties. See County and City Extra: Special Decennial Census Edition 169,176 (D. Gaquin & K. DeBrandt eds. 2002).

 See Dept, of State, How to Apply in Person for a Passport, http:// travel.state.gov/passport/get/first/first_830.html; Dept, of State, Passport Fees (Feb. 1, 2008), http://travel.state.gov/passport/get/fees/fees_837.html (total fees of $100 for a passport book and $45 for a passport card for individuals 16 and older).

 The lead opinion notes that “the record does not provide even a rough estimate of how many indigent voters lack copies of their birth certificates.” Ante, at 202, n. 20. But the record discloses no reason to think that any appreciable number of poor voters would need birth certificates absent the Voter ID Law, and no reason to believe that poor people would spend money to get them if they did not need them.

 To vote by provisional ballot, an individual must (at the circuit court clerk’s office) sign an affidavit affirming that she is “indigent” and “unable to obtain proof of identification without the payment of a fee.” Ind. Code Ann. §3-11.7-5-2.5(c)(2)(A) (West 2006). Indiana law does not define the key terms “indigent” or “unable,” but I will assume for present purposes that the Indiana Supreme Court will eventually construe these terms broadly, so that the income threshold for indigency is at least at the federal poverty level, and so that the exception covers even individuals who are facing only short-term financial difficulties.

 Indiana law allows voters to east a provisional ballot at the county clerk’s office starting 29 days prior to election day until noon of the day prior to election day, see Ind. Code Ann. §3-11.7-5-2.5, and this might enable some voters to make only one burdensome trip to the county seat. But for the voters who show up at the polls to vote and are there told that they lack the photo identification needed to cast a regular ballot, the Voter ID Law effectively forces them to make two trips.

 Much like petitioners’ statistician, the BMV “has not been able to determine the approximate number of Indiana residents of voting age who are without an Indiana driver’s license or identification card,” 458 F. Supp. 2d 775, 791 (SD Ind. 2006), but the BMV does acknowledge “that there are persons who do not currently have [the required ID] and who are, or who will be, eligible to vote at the next election,” ibid.

 The District Court explained:
“[0]ur simple comparison of raw numbers does not take into account: individuals who have died but whose Indiana driver’s license or identification cards have not expired; individuals who have moved outside the state and no longer consider themselves Indiana residents but who still retain a valid Indiana license or identification card; individuals who have moved into Indiana and now consider themselves Indiana residents but have not yet obtained an Indiana license or identification; and individuals, such as students, who are residing in Indiana temporally, are registered to vote in another state, but have obtained an Indiana license or identification.” Id., at 807, n. 43.
The District Court also identified three factors that, in its view, might require deductions of the 43,000 figure. First, the District Court noted that BMV records do not cover all forms of identification that may be used to vote under the Voter ID Law (e. g., federal photo identification, such as a passport). This is a valid consideration, but is unlikely to overcome the additions that must be made for the various factors listed above. Second, the court noted that the BMV records do not account for the exceptions to the photo identification requirement (such as the indigency and absentee-ballot exceptions). This factor does not warrant a deduction of the 43,000 number because, as I have argued, the indigency exception imposes serious burdens of its own, see swpra, at 216-218, and the absentee-ballot exception is not a wholly adequate substitute for voting in person, see n. 4, supra. Finally, the District Court noted that many individuals are not registered to vote. For reasons I lay out in n. 24, infra, I am not convinced that this fact is relevant at all.

 Although the lead opinion expresses confidence that the percentage of voters without the necessary photo ID will steadily decrease, see ante, at 188, n. 6, and suggests that the number may already have dropped, see ante, at 202, n. 20, there is reason to be less sanguine. See ACLU Sues *220 To Halt License Revocation, Fort Wayne J. Gazette, Feb. 9, 2008, p. 3C (“The American Civil Liberties Union is suing the state to prevent the possible revocation of up to 56,000 driver’s licenses that don’t match information in a Social Security database. Many of the mismatches were created by typographical errors or by people getting married and changing their last names, the [BMV] said last week when it announced it had sent warning letters to about 206,000 people in Indiana”); see also Dits, Court Date Is Set for Bid To Stop BMV Revoking Licenses, South Bend Tribune, Feb. 21,2008, p. Bl; Who To Blame in Name Game? Many Caught in Name Game; Merging BMV, Social Security Databases Forcing Many To Hire Lawyers, Post-Tribune, Jan. 8, 2008, p. A5; Snelling, Name Issue Blocks License, id., Jan. 7, 2008, p. A6.

 The State does imply that we should further discount the 43,000 estimate to exclude citizens who are not registered to vote, or who are registered but not planning to vote. See Brief for State Respondents 25; see also ante, at 200 (lead opinion) (“[T]he evidence in the record does not provide us with the number of registered voters without photo identification”). But that argument is flatly contradicted by this Court’s settled precedent. As our cases have recognized, disfranchisement is disfranchisement, whether or not the disfranchised voter would have voted if given the choice. That is why in Dunn v. Blumstein, 405 U. S. 330 (1972), the Court did not ask whether any significant number of individuals deprived of the right to vote by durational residence requirements would actually have chosen to vote. And in Harper v. Virginia Bd. of Elections, 383 U. S. 663 (1966), the Court did not pause to consider whether any of the qualified voters deterred by the $1.50 poll tax would have opted to vote if there had been no fee. Our cases make clear that the Constitution protects an individual’s ability to vote, not merely his decision to do so.

 Studies in other States suggest that the burdens of an ID requirement may also fall disproportionately upon racial minorities. See Overton, Voter Identification, 105 Mich. L. Rev. 631, 659 (2007) (“In 1994, the U. S. Department of Justice found that African-Americans in Louisiana were four to five times less likely than white residents to have government-sanctioned photo identification”); id., at 659-660 (describing June 2005 study by the Employment and Training Institute at the University of Wisconsin-Milwaukee, which found that while 17% of voting-age whites lacked a valid driver’s license, 55% of black males and 49% of black females were unlicensed, and 46% of Latino males and 59% of Latino females were similarly unlicensed).

 Unlike the Help America Vote Act of 2002,116 Stat. 1666, 42 U. S. C. § 15301 et seq. (2000 ed., Supp. V), which generally requires proof of identification but allows for a variety of documents to qualify, see ante, at 192-193 (lead opinion), Indiana accepts only limited forms of federally issued or state-issued photo identification, see n. 3, supra, and does not allow individuals lacking the required identification to cast a regular ballot at the polls. Only one other State, Georgia, currently restricts voters to the narrow forms of government-issued photo identification. See Ga. Code Ann. § 21-2-417 (Supp. 2007). But a birth certificate is not needed to get a Georgia voter identification card. See §21-2-417.1; Ga. Comp. Rules & Regs., Rule 183-1-20.01 (2006).
Missouri’s Legislature passed a restrictive photo identification law comparable to Indiana’s, but the Missouri Supreme Court struck it down as violative of the State Constitution. Weinschenk v. State, 203 S. W. 3d 201 (2006) (per curiam). Florida requires photo identification, but permits the use of several forms, including a debit or credit card; military identification; student identification; retirement center identification; neighborhood association identification; and public assistance identification. See Fla. Stat. Ann. § 101.043(1) (West Supp. 2008). Moreover, a Florida voter who lacks photo identification may cast a provisional ballot, and that ballot will be counted so long as the signature on the ballot matches the one on the voter’s registration. §§ 101.043(2), 101.048.
All other States that require identification at the polls either allow voters to identify themselves using a variety of documents, see Ala. Code *223 § 17-9-30 (2007); Alaska Stat. § 15.15.225 (2006); Ariz. Rev. Stat. Ann. § 16-579 (West 2006); Ark. Code Ann. § 7-5-305(a)(8) (2007); Colo. Rev. Stat. §§1-1-104(19.5), 1-7-110 (2007); Ky. Rev. Stat. Ann. §117.227 (Lexis 2004); Mont. Code Ann. §13-13-114 (2007); N. M. Stat. Ann. §§1-1-24,1-12-7.1, as amended by 2008 N. M. Laws ch. 59; N. M. Stat. Ann. § 1-12-8 (Cum. Supp. 2007); Ohio Rev. Code Ann. §§ 3503.16(B)(1), 3505.18 (Lexis Supp. 2007); S. C. Code Ann. §§7-5-125,7-13-710 (Cum. Supp. 2007); Tenn. Code Ann. §2-7-112 (2003); Tex. Elec. Code Ann. §§63.001-63.009 (West 2003 and Supp. 2007); §63.0101 (West Supp. 2007); Wash. Rev. Code §29A.44.205 (2006), or allow voters lacking identification to cast a regular ballot upon signing an affidavit (or providing additional identifying information), see Conn. Gen. Stat. §9-261 (2007); Del. Code Ann., Tit. 15, §4937 (2007); Haw. Rev. Stat. §11-136 (2006 Cum. Supp.); La. Stat. Ann. §18:562 (West Supp. 2008); Mich. Comp. Laws Ann. § 168.523(1) (West Supp. 2007); N. D. Cent. Code Ann. § 16.1-05-07 (Lexis Supp. 2007); S. D. Codified Laws §§ 12-18-6.1,12-18-6.2 (2004); Va. Code Ann. §24.2-643 (Lexis 2006).

 See generally R. Saltman, The History and Politics of Voting Technology: In Quest of Integrity and Public Confidence (2006) (tracing the history of changes in methods of voting in the United States, and the social and political considerations behind them).

 The lack of evidence of in-person voter impersonation fraud is not for failure to search. See, e.g., Lipton & Urbina, In 5-Year Effort, Scant Evidence of Voter Fraud, N. Y. Times, Apr. 12, 2007, p. Al (“Five years after the Bush administration began a crackdown on voter fraud, the Justice Department has turned up virtually no evidence of any organized effort to skew federal elections, according to court records and interviews”).

 “As I was going up the stair /1 met a man who wasn’t there.” H. Mearns, Antigonish, reprinted in Best Remembered Poems 107 (M. Gardner ed. 1992).

 See Indiana BMV, Digital Drivers License: Frequently Asked Questions, “What is a digital watermark and why is Indiana incorporating it into their driver license?”, http://www.in.gov/bmv/3382.htm.

 In the words of Indiana’s Governor, Mitch Daniels: “ ‘Not very long ago, Indiana driver’s licenses were a late-night talk show joke [because of] the ease of their fraudulent issuance and also their duplication.... [The new design] will make particularly their duplication dramatically more difficult.’ ” Udell, Digital Driver’s Licenses Designed To Stem ID Theft, Evansville Courier & Press, June 7, 2007, p. B6.

 On such flimsy evidence of fraud, it would also ignore the lessons of history to grant the State’s interest more than modest weight, as the interest in combating voter fraud has too often served as a cover for unnecessarily restrictive electoral rules. See F. Ogden, The Poll Tax in the South 9 (1958) (“In Arkansas and Texas, the argument was frequently presented *231 that a poll tax payment prerequisite would purify elections by preventing repeaters and floaters from voting”); see also Brief for Historians et al. as Amici Curiae 4-15 (detailing abuses); R. Hayduk, Gatekeepers to the Franchise: Shaping Election Administration in New York 36 (2005) (“In both historical and contemporary contexts, certain groups have had an interest in alleging fraud and thereby shaping electoral rules and practices in a restrictive direction, and other groups have had an opposite interest”).

 Florida has accommodated voters in this manner. In Florida a voter who casts a provisional ballot may have that vote counted if the voter’s signature on the provisional-ballot certification matches the signature on the voter’s registration. See Fla. Stat. Ann. §§101.043, 101.048. The voter is not required to make a second trip to have her provisional ballot counted.

 The voting-rolls argument also suggests that it would not be so difficult to detect in-person voter fraud after all. If it is true that practitioners of fraud are most likely to vote in the name of registered voters whom they know to have died or left the jurisdiction, then Indiana could simply audit its voting records to examine whether, and how often, in-person votes were cast using these invalid registrations.